UNITED STATES DISTRICT COURT                                    FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

MARIE FLAHERTY,

                    Plaintiff,

          -v-                                              No. 03 Civ. 2167 (LTS)(HBP)

JASON FILARDI, GEORGE N. TOBIA, JR., BURNS
AND LEVINSON, LLP, HYDE PARK ENTERTAINMENT,
ASHOK AMRITRAJ, DAVID HOBERMAN, TODD
LIEBERMAN, WALT DISNEY COMPANY, BUENA
VISTA MOTION PICTURES COMPANY, TOUCHSTONE
PICTURES, BUNGALOW 78 PRODUCTIONS, THE
KUSHNER-LOCKE COMPANY, MEESPIERSON FILM CV,
WMG FILM, JANE BARTELME, COOKIE CAROSELLA,
DANA OWENS d/b/a/ QUEEN LATIFAH, and DOES 1
THROUGH 10, inclusive,

                    Defendants.

_____

                          OPINION AND ORDER

APPEARANCES:

  MARIE FLAHERTY, ESQ.                    QUINN EMANUEL URQUHART
  509 Madison Avenue                      OLIVER & HEDGES, LLP
  Suite 2004                              By: Jeffrey A. Conciatori, Esq.
  New York, New York 10022                    Lara G. Corey, Esq.
                                          335 Madison Avenue, 17th Floor
                                          New York, New York 10017

  *Plaintiff Pro Se*                      *Attorneys for Defendants The Walt Disney*
                                          *Company, Buena Vista Motion Pictures Group,*
                                          *Touchstone Pictures, Hyde Park Entertainment,*
                                          *Jason Filardi and Dana Owens*

                                          SHERIN AND LOGIN, LLP
                                          By: Robert J. Muldoon, Jr., Esq.
                                          101 Federal Street
                                          Boston, Massachusetts 02110

                                          *Attorneys for Defendants George N. Tobia, Jr.*
                                          *and Burns and Levinson, LLP*

                LAURA TAYLOR SWAIN, United States District Judge

Plaintiff Marie Flaherty ("Plaintiff" or "Flaherty"), appearing pro se, brings this action alleging that Defendants Jason Filardi ("Filardi"), George N. Tobia, Jr., Esq. ("Tobia"), Burns and Levinson, LLP ("B&L"), Hyde Park Entertainment ("Hyde Park"), Ashok Amritraj ("Amritraj"), David Hoberman ("Hoberman"), Todd Lieberman ("Lieberman"), the Walt Disney Company ("Disney"), Buena Vista Motion Pictures Group ("Buena Vista"), Touchstone Pictures ("Touchstone"), Bungalow 78 Productions ("Bungalow 78"), the Kushner-Locke Company ("Kushner-Locke"), Meespierson Film CV ("Meespierson"), WMG Film ("WMG"), Jane Bartelme ("Bartelme"), Cookie Carosella ("Carosella"), Dana Owens d/b/a Queen Latifah ("Owens"), and Defendants sued as Does 1 through 10 (collectively, "Defendants") infringed the copyright on her screenplay, "Amoral Dilemma," in creating the movie "Bringing Down the House," in violation of 17 U.S.C. § 101 et seq. Defendants Disney, Buena Vista, Touchstone, Hyde Park, Filardi, and Owens ("the Disney Defendants") move, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment on Plaintiff's copyright claims, Counts One through Four, which assert copyright infringement, contributory copyright infringement, vicarious copyright infringement, and conspiracy to commit copyright infringement, respectively; as well as her related claims under the Lanham Act, 15 U.S.C. §§ 1117, 1125(a) (Count Five); unfair competition under the California Business and Professional Code § 17200 (Count Ten); New York common law unfair competition (Count Eleven), fraud (Count Twelve), unjust enrichment (Count Fourteen), and quantum meruit (Count Fifteen); and Plaintiff's claims for declaratory and injunctive relief (Counts Sixteen and Seventeen of the Complaint, respectively). Defendants Tobia, B&L, Amritraj, Hoberman, and Lieberman move for partial summary judgment on the same grounds. The Disney Defendants, together with Defendants Tobia, B&L,

Amritraj, Hoberman and Lieberman, are hereinafter referred to as the "Moving Defendants."

The motion papers filed by Tobia and B&L incorporate by reference the legal arguments made in the Disney Defendants' brief.[1]  Amritraj, Hoberman and Lieberman also filed motion papers incorporating the Disney Defendants' argument, together with an application for a stay of their obligation to answer the First Amended Complaint pending adjudication of the summary judgment motion practice.  Plaintiff has cross-moved to compel Amritraj, Hoberman, and Lieberman to file an answer, as well as for attorneys' fees relating to the motion practice.

Also before the Court are Plaintiff's application pursuant to Rule 56(f) for a continuance to allow for discovery, Plaintiff's objections to a September 24, 2003, order of Magistrate Judge Henry B. Pitman, staying discovery pending resolution of the instant summary judgment motion, and Plaintiff's objections to Judge Pitman's June 29, 2004, order, denying Plaintiff's motion for an evidentiary hearing and disqualification of Disney's counsel from representing Defendant Filardi, and for attorney's fees.  Plaintiff also moves to strike a declaration in support of Defendants' motion for partial summary judgment by Defendants' counsel Jeffrey A. Conciatori, and a February 6, 2004, letter from Conciatori in support of the motion.

The Court has subject matter jurisdiction of Plaintiff's copyright and Lanham Act claims pursuant to 28 U.S.C. sections 1331, 1338(a), and 1338(b), and of the various state law

---

[1]     In their motion papers, Tobia and B&L purport to move for judgment as to Count Eight of the Complaint.  Because neither the Disney papers they incorporate by reference nor any other element of their motion addresses Count Eight, their motion is denied as to Count Eight.

claims pursuant to 28 U.S.C. section 1367.

The Court has considered carefully all of the submissions made in connection with these motions. For the reasons that follow, Defendants Amritraj, Hoberman and Lieberman's application for a stay of their obligation to answer the First Amended Complaint pending adjudication of the summary judgment motion practice is granted; Plaintiff's cross-motion to compel them to file an immediate answer is denied; Plaintiff and those Defendants are directed to make further submissions in connection with Plaintiff's application pursuant to Fed. R. Civ. P. 4(d)(5); Plaintiff's request to modify or set aside Magistrate Judge Pitman's September 24, 2003 order is denied; Plaintiff's request to vacate Magistrate Judge Pitman's June 29, 2004 order is denied; both of Plaintiff's motions to strike are denied; and Plaintiff's Rule 56(f) application is denied. Defendants' respective motions for partial summary judgment are granted in part and denied in part.

## I.

## BACKGROUND

The instant partial summary judgment motion practice is narrowly focused on Plaintiff's claims premised on alleged similarities between her screenplay and the finished film "Bringing Down the House." For purposes of the motion practice, the Moving Defendants concede access to Plaintiff's screenplay and do not contest her ownership of a valid copyright in that screenplay. The following background facts (other than those specifically characterized below as allegations) appear to be undisputed for purposes of this motion practice.

A.    Parties

Plaintiff Marie Flaherty ("Flaherty"), is an actor, writer, lawyer and author of the screenplay "Amoral Dilemma." (Compl. ¶ 4.)[2]  Defendant Filardi is the screenwriter of the screenplay "Jailbabe.com," which was later renamed "Bringing Down the House." (Id. ¶ 21.) Defendant Tobia is a member of the law firm Burns and Levinson, LLP.  Plaintiff alleges that Tobia represented both Filardi and herself at relevant times.  (Id. ¶ 22.)  Defendants Hyde Park, Amritraj, Hoberman, Lieberman, Disney, Buena Vista, Touchstone, Bungalow 78, Kushner-Locke, Meespierson, WMG, Bartelme, Carosella, and Owens are all producers and/or distributors of the movie "Bringing Down the House."  (Id. ¶¶ 24-38.)

After completing her screenplay "Amoral Dilemma," Plaintiff registered her work with the Writers Guild of America on June 25, 1999 (registration no. 127978-00), and with the United States Copyright Office on April 19, 2000 (registration no. PA-014-229).  (Id. ¶¶ 44-45.) Plaintiff alleges that, in or about August 1999, she contacted Defendant Tobia in order to seek representation to "shop" her screenplay in the hopes of selling it.  (Id. ¶¶ 47-48.)  After a telephone discussion with Defendant Tobia in which Plaintiff summarized (or "pitched") "Amoral Dilemma," Defendant Tobia allegedly agreed to represent Plaintiff and, during a follow-up personal meeting, Plaintiff provided Defendant Tobia with a copy of her screenplay. (Id. ¶¶ 48-50.)  Plaintiff alleges that, during these conversations, Defendant Tobia informed Plaintiff that he was, at that time, also representing Defendant Filardi, who was then working on a screenplay entitled "Himbos," a story about two men who move to Miami to become "male

_____

[2]      All citations to the "Complaint" are to Plaintiff's First Amended Complaint, dated July 17, 2003.

bimbos." (Id. ¶ 48.)

Plaintiff further alleges that Defendant Tobia contacted her in March 2000 to report that he had sold a script written by Defendant Filardi, entitled "Jailbabe.com," which Tobia explained was a comedy about "a guy who meets a female prisoner on-line." (Id. ¶ 63.) Plaintiff alleges that Defendant Tobia had provided Defendant Filardi with a copy of her screenplay for "Amoral Dilemma" and that Defendant Filardi essentially plagiarized her ideas, thereby violating her copyright on the work.

As noted above, the Moving Defendants concede, for purposes of the instant summary judgment motion, that they had access to Plaintiff's screenplay. They argue that Defendant Filardi did not improperly use Plaintiff's ideas and deny that "Bringing Down the House" bears sufficiently substantial similarity to "Amoral Dilemma" to be violative of Plaintiff's copyright. (Defendants' Rule 56.1 Statement ("DR 56.1") ¶ 7.)

In support of their summary judgment motion, the Moving Defendants have submitted Plaintiff's screenplay for "Amoral Dilemma" (Decl. of Jeffrey A. Conciatori, Ex. A). Plaintiff acknowledges that the document before the Court is a true and correct copy of her screenplay. (Plaintiff's Rule 56.1 Statement ("PR 56.1") ¶ 1.) The Moving Defendants have also proffered a copy of the movie, "Bringing Down the House," as released on videotape. (Conciatori Decl., Ex. B.) The Court has reviewed both Plaintiff's screenplay and Defendants' movie in connection with the summary judgment motion. Their respective material elements are summarized below.

B.      The Allegedly Similar Works

        1.      "Amoral Dilemma"

"Amoral Dilemma" opens by introducing Kelly Gallagher, a young Manhattan insurance attorney who is dissatisfied with her work and the direction of her life.  She has just left her boyfriend, Dave, who is a senior attorney in her office, after discovering that he had an affair with the younger mail room clerk, Jane.  Although she is unhappy with her job, she has excelled at work, and in the beginning of the story, she has just saved her client from an insurance liability claim in connection with an eight year-old boy's death.

Kelly's meets her best friend, Nancy, who is also unhappy with her life, at a bar, and the two women decide that they should begin corresponding with a death row prisoner and use him as a means of seeking revenge on men.  Kelly uses a legal search website to locate Jake Mannion, a prisoner on death row at a Pennsylvania state prison who was convicted for the rape and murder of a young woman.  Kelly and Nancy create a phony identity and send a letter to Jake in furtherance of their scheme.

At work, Kelly is assigned to defend another case, this one involving an automobile accident where two teenage girls were killed while driving to school.  Kelly's former boyfriend, Dave, is also assigned to the case, increasing the tension between the two characters. Meanwhile, Kelly and Nancy continue to correspond with Jake using their phony identity, and Nancy, unbeknownst to Kelly, becomes obsessed with Jake, writing him several additional letters without Kelly's knowledge.  After discovering that Jake wrote to the governor requesting clemency, Kelly also becomes increasingly interested in Jake, and begins research to determine whether he might be innocent of the crimes for which he was convicted.

As the story continues, Kelly wins another case for her insurance client when she discovers evidence in the car accident case that compels the teenage girls' families to withdraw their insurance claims but, despite her success, she continues to be dissatisfied with her job. One day shortly thereafter, while at work, Kelly sees an unfamiliar man leaving the office with the mail room clerk, Jane (with whom Dave was having an affair). The next evening, Dave and Kelly are working late in the office when a man comes in and attacks them, stabbing Dave. Kelly believes that she was the intended target because of her investigation into Jake's case. Kelly also realizes that Jane did not come to work that day, and thinks that the man who stabbed Dave may be the same man with whom Jane left the office the day before; Kelly therefore decides that she and Nancy must go to Jane's apartment. When they get to Jane's apartment, they find that she has been murdered.

Kelly and Nancy then travel to Pennsylvania to further investigate the Jake Mannion case. Kelly meets with the district attorney and the assistant district attorney, and ultimately discovers DNA evidence which confirms Jake's innocence and leads the governor to grant a pardon for Jake. Meanwhile, Nancy goes to the prison to meet with Jake and gives him her contact information, which ends up in the hands of Gary Satchel, a fellow prisoner who frequently bullies Jake. Back in Manhattan, the police apprehend the brother of one of the teenage girls killed in the car accident as a suspect in the attacks on Kelly, Dave and Jane. Realizing that the attacks were work-related, Kelly becomes even more distraught about her job and decides to quit.

In the final scenes of the screenplay, the prison and the district attorney's office turn out to be corrupt. Gary Satchel is released from prison instead of Jake Mannion, when the

prison officials intentionally switch the men's identities.  Jake is executed.  A tattoo on the

assistant district attorney's knuckles reveals that he is actually one of the men responsible for the

Pennsylvania rape and murder, and Gary Satchel, having stolen Nancy's contact information from

Jake, goes to her home, apparently intending to murder her.


2.    "Bringing Down the House"

"Bringing Down the House" begins with an on-line chat between Peter Sanderson,

a divorced, middle-aged, white, tax attorney, and a woman named Charlene, who uses the

pseudonym "Lawyergirl."  Peter believes that Charlene is a white attorney based on a picture she

provided and tells certain white lies about his appearance to make himself sound more attractive.

Although he has no experience in the criminal law field, Peter provides advice to "Lawyergirl"

regarding one of her clients.  Peter and "Lawyergirl" then decide to meet at his home for a first

date.

In the office, Peter is competing with a younger colleague to secure a new client,

Mrs. Arness, an elderly heiress of a billion dollar company, and decides to forego vacation plans

with his children so that he will be available to work on the Arness matter.  Peter's attempts to

secure Mrs. Arness's business are made more difficult by her demanding personality and the

absurdity of having to deal with her prized French bulldog, "William Shakespeare," who appears

in costume and goes everywhere with her.

When "Lawyergirl" appears at Peter's home for their date, he is surprised to

discover that she looks nothing like her picture and, rather than being a white attorney, is in fact a

black ex-convict named Charlene who just escaped from prison.  Although Peter makes several

attempts to throw Charlene out, she persuades him to let her stay while she works on the appeal of her conviction for armed robbery.  Concerned that his law firm colleagues and his nosy and overtly racist neighbor might not approve of Charlene, Peter creates a number of schemes to hide her identity, including introducing her as his children's nanny.  Meanwhile, upon meeting Charlene, Peter's best friend and co-worker, Howie, is smitten with her and tries to charm her with his knowledge of "urban slang."  Throughout the course of the movie, despite various awkward situations that Charlene's presence creates for Peter, he becomes less uptight and also grows closer to his children.

The movie builds towards its climax as Mrs. Arness discovers, while having dinner at Peter's home, that Charlene is not the children's nanny but rather an escaped convict.  Mrs. Arness refuses to hire Peter, and Peter kicks Charlene out of his house.  Peter then learns that Charlene was framed for her crime by her ex-boyfriend and goes to an urban nightclub in an attempt to locate the former boyfriend and obtain a taped confession that will exonerate Charlene. Meanwhile, Howie and Charlene have kidnapped Mrs. Arness and her dog and, fearing for Peter's safety, end up going to the nightclub to track Peter down.

After a series of antics, including donning urban-style clothing to try to blend in at the nightclub, Peter is able to locate Charlene's ex-boyfriend and secures a confession from him confirming that he framed Charlene.  As Peter's scheme unravels, however, a fight breaks out at the nightclub during which Charlene, who has arrived with Howie and Mrs. Arness, is shot in the chest but is not seriously injured because the bullet hit Peter's cell phone, which she had tucked into her cleavage.  As the movie comes to a close, Charlene is formally exonerated, Mrs. Arness changes her mind about Peter and hires him as her attorney, Charlene and Howie begin dating,

and Peter quits his law firm job to open his own practice overlooking the beach.  Peter realizes the importance of family and reconciles with his ex-wife after he confesses that he has been in love with her all the while.

## II.

## DISCUSSION

The Court will discuss the pending procedural applications, including Plaintiff's objections to Magistrate Judge Pitman's orders, before turning to the motions for partial summary judgment.

A.     Application of Defendants Amritraj, Hoberman, and Lieberman for Stay of Obligation to Answer

Defendants Amritraj, Hoberman, and Lieberman, all producers of "Bringing Down the House," move for a stay of their obligation to answer the First Amended Complaint pending adjudication of the pending partial summary judgment motion practice.  Plaintiff opposes their motion, arguing, essentially, that she has been prejudiced by these Defendants' failure to file an answer in advance of moving for summary judgment.  Plaintiff also cross-moves for an order requiring Defendants Amritraj, Hoberman, and Lieberman to file an answer and awarding costs and fees to Plaintiff for Defendants' failure to mitigate her litigation expenses.

First, Defendants Amritraj, Hoberman, and Lieberman are well within their rights to move for summary judgment.  Rule 56 provides that "[a] party seeking to recover upon a claim . . . may, at *any* time after the expiration of 20 days from the commencement of the action . . .

move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a) (emphasis added). Defendants filed their motion almost four months after Plaintiff filed her First Amended Complaint. Second, because the instant motion for partial summary judgment is based on a comparison of Plaintiff's screenplay and Defendants' movie to determine whether the two works are substantially similar for copyright purposes, the absence of an answer from these Producer-Defendants does not in any way prejudice Plaintiff in the context of the motion practice. In fact, Plaintiff's copyright-related claims against these Defendants are the same as her claims against the other Disney Defendants who have moved for summary judgment. Plaintiff's argument that responsive pleadings must of necessity be considered in adjudicating a summary judgment motion is incorrect as a matter of law and provides no basis for a finding of prejudice in the context of this case. Nor, in light of Judge Pitman's order staying all discovery pending adjudication of the summary judgment motions, is Plaintiff prejudiced by the lack of an answer from these defendants with respect to the claims against them that are not implicated in the current motion practice. Accordingly, the motion of Defendants Amritraj, Hoberman, and Lieberman for a stay of their obligation to answer is granted.

Plaintiff's cross-motion also seeks an award, pursuant to Rule 4(d)(5) of the Federal Rules of Civil Procedure, of fees and expenses incurred in connection with her service of the Complaint on these defendants and her motion to collect those expenses. Plaintiff's affidavit in support of her motion provides a great degree of detail concerning her efforts to solicit waivers pursuant to Rule 4(d) of the Federal Rules but is insufficient to facilitate a determination of those defendants' noncompliance with the waiver provision because it fails to proffer information as to the time frame in which Plaintiff requested a response to the request for waiver (see Fed. R. Civ.

P. 4(d)(2)(F), which provides that a written waiver request "shall allow the defendant a reasonable time to return the waiver, which shall be at least 30 days from the date on which the request is sent"). These defendants, who expressly waived "any objection to the adequacy of service of the pleadings herein" in their November 12, 2003, notice of the instant motion, do not seem to contest the premise that their failure to respond promptly to Plaintiff's request resulted in additional service-related expenses, but contend that any award pursuant to Rule 4(d)(5) should be held in abeyance pending final adjudication of the case. The Court finds that holding such an award in abeyance is unnecessary, and hereby directs Plaintiff to file and serve within 30 days from the date hereof a **concise** affidavit summarizing the timing of her efforts to serve these defendants, the expenses incurred in connection therewith, and her expenses incurred in connection with this motion practice, and providing copies of the requests for waiver showing the time frame she allotted for response. Defendants Amritraj, Hoberman, and Lieberman shall file and serve any objections to the expense amounts requested within ten days of receipt of Plaintiff's submission, and Plaintiff shall file and serve any reply within five days of receipt of Defendants' objections.

      B.     Plaintiff's Objections to Magistrate Judge Pitman's Orders

      1.     Standard of Review

This Court, on August 12, 2003, referred the instant action to Magistrate Judge Henry B. Pitman for general pretrial purposes, which includes scheduling, discovery, non-dispositive pretrial motions, and settlement. Such a reference is authorized by with 28 U.S.C. § 636(b)(1)(A), which allows district judges, with some exceptions, to "designate a magistrate judge to hear and determine any pretrial matter pending before the court." 28 U.S.C.A. § 636(b)(1)(A)

(West 2002). However, "[a] judge of the court may reconsider any [non-dispositive] pretrial matter . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." Id. Thus, pursuant to the Federal Rules of Civil Procedure, following a party's objection to a magistrate's order, "[t]he district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a).

A magistrate judge's order is "clearly erroneous" where "'on the entire evidence,' the [district court] is 'left with the definite and firm conviction that a mistake has been committed.'" Easley v. Cromartie, 532 U.S. 234, 243 (2001) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). The clearly erroneous standard of review is "highly deferential [, and] . . . magistrate judges are afforded broad discretion in resolving non-dispositive disputes and reversal is appropriate only if their discretion is abused." Derthick v. Bassett-Walker, Inc., Nos. 90 Civ. 5427(JMC), 90 Civ. 7479(JMC), & 90 Civ. 3845(JMC), 1992 WL 249951, at *8 (S.D.N.Y. Sept. 23, 1992).


2.      September 24, 2003 Order

Judge Pitman issued an Order on September 24, 2003, granting the Disney Defendants' motion to stay all discovery in this matter pending resolution of their motion for partial summary judgment on Plaintiff's copyright and related claims. Defendants' summary judgment motion is directed to Plaintiff's copyright infringement and related claims regarding the movie only, and Judge Pitman found that resolving such claims in advance of discovery as to her copyright and other claims regarding earlier drafts of the movie screenplay would narrow the

scope of discovery.

None of Plaintiff's objections to Judge Pitman's order demonstrates that Judge Pitman's determination was clearly erroneous or contrary to law in any respect. First, Plaintiff asserts that Judge Pitman reached the merits of the summary judgment issue and applied Rule 56 standards in his determination on the stay of discovery. This argument is entirely unsupported by the record; Judge Pitman's determination was procedural and in no way determinative of any dispositive issue in this action.

Plaintiff also objects to the fact that the stay was issued as to all discovery and asserts that she should have been permitted to proceed with discovery with respect to the screenplay draft copyright claims. Judge Pitman considered this argument and acknowledged that Plaintiff might have viable copyright claims as to the screenplay drafts but determined that the overall stay was warranted because a ruling on the copyright claims as to the movie could narrow the total scope of the litigation. Even if such a decision delayed discovery that could have proceeded sooner with respect to the screenplay draft copyright issues, Plaintiff has not demonstrated that Judge Pitman committed clear error in his decision to stay all discovery pending resolution of the copyright claims as to the movie. Moreover, discovery regarding the screenplay drafts would have had no bearing on determination of the copyright claims regarding the movie, given that the "ultimate test of infringement must be the film as produced and . . . [displayed]" without consideration of preliminary scripts. Davis v. United Artists, Inc., 547 F. Supp. 722, 724 n. 9 (S.D.N.Y. 1982)[3] Likewise, Plaintiff's argument that it is generally

---

[3]     Plaintiff's citations to cases such as Jones v. CBS, Inc., 733 F. Supp. 748 (S.D.N.Y. 1990), and Robinson v. Viacom Intl., Inc., No. 93 Civ. 2539 (RPP),

inappropriate to consider a motion for summary judgment before allowing discovery is unavailing

in this case because the Court must resolve the copyright infringement question posed in the

instant motion practice solely by comparing Plaintiff's screenplay and Defendants' finished

movie. <u>Walker v. Time Life Films, Inc.</u>, 784 F.2d 44, 49 (2d Cir. 1986)[4]; <u>Historical Truth Prods.,</u>

<u>Inc. v. Sony Pictures Entertainment</u>, No. 93 Civ. 5529 (MBM), 1995 WL 693189, at *7 (S.D.N.Y.

Nov. 22, 1995). In addition, because the voluminous documents of which Plaintiff claims she is

being deprived are not necessary to resolve the movie copyright claim, the objection that her due

process rights were somehow violated by the stay of discovery is unfounded. (<u>See</u> Pltf. Obj. at

19.)

   Plaintiff further objects to Judge Pitman's acceptance of Defendants' concession

that they had access to Plaintiff's screenplay for purposes of the motion to stay and asserts that

allowing Defendants to do so amounts to a miscarriage of justice and violation of her due process

rights. Plaintiff provides no supporting analysis for this argument nor does she explain, beyond a

---

1995 WL 417076, at *1 (S.D.N.Y. July 13, 1995), are inapposite because those cases involved television shows where each episode was based on its own script, necessarily causing the courts to review several scripts. Here, the copyright issue involves Plaintiff's one script and the finished movie.

[4] Plaintiff cites <u>Walker</u> for the proposition that, even where Defendants concede access to Plaintiff's work, earlier drafts of scripts could have served as evidence that borrowing occurred. <u>Walker</u>, however, found any potential error in exclusion of early drafts harmless in light of the court's conclusion, assuming access, borrowing, and copying, that there was no substantial similarity between the works. <u>Walker</u>, 784 F.2d at 52. Here, the Moving Defendants' argument is premised on such lack of substantial similarity between the screenplay and the final film. If they succeed on their argument, drafts will be irrelevant to the determination. If they fail, further proceedings, including discovery, can be pursued as appropriate. Accordingly, it was not clear error or contrary to law for Judge Pitman to stay discovery at this stage of the litigation.

conclusory assertion, how Magistrate Judge Pitman's acceptance of a limited concession results in clear error. Plaintiff's assertion that she has been prejudiced because the Defendants have shared documents among themselves is similarly conclusory and unfounded. (See id.)

Plaintiff has failed to demonstrate that Judge Pitman committed clear error or acted in a manner contrary to law in rendering his September 24, 2003, Order. Accordingly, Plaintiff's objections are overruled, and the Order will stand.


3.      June 29, 2004 Order

Judge Pitman's June 29, 2004, Order denied Plaintiff's motions for an evidentiary hearing relating to the disqualification of the law firm of Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP ("Quinn Emanuel") from representing Defendant Filardi (in addition to Disney), and for an order effecting such disqualification, awarding her attorneys' fees and costs, and granting any other relief that the court deems just and proper.

In bringing a motion for disqualification, Plaintiff bears a heavy burden. In order to satisfy that burden, she must come forward with evidence to show that an actual conflict of interest exists. Agee v. Paramount Communications, Inc., 853 F. Supp. 778, 784 (S.D.N.Y. 1994) rev'd in part on other grounds, 59 F.3d 317 (2d Cir. 1995). Here, Plaintiff's arguments regarding a potential conflict of interest among the Disney Defendants and Defendant Filardi are that those defendants are pointing the finger of liability at each other as part of their defense strategy, that Filardi may potentially be obligated to indemnify Disney, and that there is an appearance of impropriety in allowing Quinn Emanuel to represent both Disney and Filardi. Judge Pitman considered each of these arguments and found that Defendants' positions in the litigation are such

that they do not create a conflict of interest.  Contrary to Plaintiff's assertion that Judge Pitman's decision was not based on evidence, he did consider counsel Jeffrey A. Conciatori's declaration as well as the pleadings already in existence in the litigation, such as the Defendants' answers.

Plaintiff cites no authority holding that an evidentiary hearing is required in every instance where a motion for disqualification is brought.  Indeed, given the heavy burden for even bringing a motion for disqualification, a hearing clearly is not required in every case.  In addition, although Plaintiff asserts that she was somehow prejudiced by a delay in Judge Pitman's ruling on these matters, she proffers no evidence of prejudice.  Because it cannot be said that Judge Pitman committed clear error or that his order is contrary to law, Plaintiff's request to vacate the Order and her request for this Court to hold an evidentiary hearing on this matter are denied.

C.      Plaintiff's Motions to Strike

1.      Declaration of Defendant's Counsel Jeffrey A. Conciatori

Plaintiff moves to strike Defendants' counsel Jeffrey A. Conciatori's Declaration in support of Defendants' motion for partial summary judgment as violative of Rule 56(e), arguing that his declaration is not based on personal knowledge.  Conciatori's affidavit simply outlines a brief background of the litigation and proffers both Plaintiff's screenplay (Conciatori Decl. Ex. A) and a commercially-packaged copy of the videotape of "Bringing Down the House" (Conciatori Decl. Ex. B), both of which are highly relevant to Defendants' motion for partial summary judgment on copyright infringement and related claims regarding the movie.

Plaintiff admits that the screenplay is an accurate copy (PR 56.1 ¶ 1), and proffers no evidentiary basis for disputing Conciatori's assertion of personal knowledge as to the basic

undisputed facts. There is also no evidentiary basis for disputing Conciatori's assertion of personal knowledge of the contents of the videotape. Accordingly, Plaintiff's motion to strike Conciatori's declaration is denied.

        2.      Conciatori's February 6, 2004 Letter

Plaintiff also moves to strike a February 6, 2004, letter submitted to the Court by Conciatori on the basis that the letter constituted an improper post-briefing submission and that the letter was ex parte because Plaintiff received the letter a few days after it was submitted to the Court. (Defendants sent the letter to Plaintiff by United States mail.)

First, Conciatori's letter, contrary to Plaintiff's assertion, was not ex parte. Plaintiff received a copy of the letter well before the Court considered it. Second, although the letter was not specifically contemplated or authorized by the Court, it was nonetheless not so improper as to warrant being stricken. The letter merely sought to bring to the Court's attention a recently decided copyright infringement case in the Central District of California. Accordingly, Plaintiff's motion to strike the February 6, 2004, letter is denied. In addition, Plaintiff's request for sanctions is denied, and her request for fees in connection with this motion to strike is denied because the motion practice was unnecessary.

        D.     Defendants' Motion for Partial Summary Judgment

        1.     Rule 56 Standard

Summary judgment shall be granted in favor of a moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Burt Rigid Box, Inc. v. Travelers Property Casualty Corp., 302 F.3d 83, 90 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 247-48). In the summary judgment context, a fact is material "if it might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (internal citation omitted). The Second Circuit has explained that "the party against whom summary judgment is sought . . . . 'must do more than simply show that there is some metaphysical doubt as to the material acts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

The Second Circuit has held that "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between the two works concerns only *non*-copyrightable elements of the plaintiff's work . . . or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Warner Bros., Inc. v. Am. Broadcasting Co., 720 F.2d 231, 239-40 (2d Cir. 1983) (internal quotation omitted) (emphasis in original). The Court, having reviewed Plaintiff's screenplay and

Defendants' movie, finds that Defendants' motion for summary judgment on the copyright and related claims can be resolved as a matter of law.

> 2.    Copyright Infringement

> a.    Copying claim

In order to prove copyright infringement, a plaintiff must establish that (1) she is the owner of a valid copyright and that (2) there has been copying of original elements of the copyrighted work.  <u>Williams v. Crichton</u>, 84 F.3d 581, 587 (2d Cir. 1996).  In the absence of direct evidence of copying, copying may nonetheless be proven indirectly by evidence (1) establishing that the defendant had access to the copyrighted work, and that (2) the defendant's work bears substantial similarity to protected elements of the copyrighted work.  <u>Id.</u>  For purposes of the instant summary judgment motion, Defendants concede access to Plaintiff's screenplay and also concede that she owns a valid copyright on her screenplay, "Amoral Dilemma."  (DR 56.1 ¶¶ 7, 8.)  The relevant inquiry, therefore, is whether "Bringing Down the House" contains elements which bear substantial similarity to protected elements of "Amoral Dilemma."

In determining substantial similarity, the Court uses the "ordinary observer" test. The Court considers whether the average lay observer would recognize the challenged material as having been copied from the copyrighted work.  <u>Historical Truth Prods., Inc. v. Sony Pictures Entertainment</u>, No. 93 Civ. 5529 (MBM), 1995 WL 693189, at *7 (S.D.N.Y. Nov. 22, 1995).[5]  In

---

[5]    Plaintiff argues that the ordinary observer test does not apply in this case because the works in this case come from two different genres (comedy and drama), citing <u>Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.</u>, 150 F.3d 132 (2d Cir. 1998).  The distinction in <u>Castle Rock Entertainment</u>, however, was made in

examining the similarities between the two works, the Court is to consider such aspects as the themes, total concept and feel of the two works, the characters, the plots, and the settings. Williams, 84 F.3d at 588. The Court's examination of substantial similarities between the two works excludes , however, elements constituting "scenes a faire," that is, "sequences of events that 'necessarily result from the choice of a setting or situation' and do not enjoy copyright protection." Williams, 84 F.3d at 587 (quoting Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986)).

i.      Themes

The principal themes of "Amoral Dilemma" deal with the young protagonist's dissatisfaction with her legal practice as an attorney in New York City, the corruption of the legal system as demonstrated by her civil practice, and the corruption of the prison and prosecutorial offices that she encounters. In some part, the screenplay also addresses women's struggles with men as illustrated by Kelly's having to cope with the failed relationship with her ex-boyfriend and by Kelly and Nancy's desire to concoct a scheme to correspond with a prisoner to get revenge on men.

The themes of "Bringing Down the House" principally address cultural differences among individuals of different socioeconomic and racial backgrounds, and a working father and attorney's struggle to balance work and family obligations. Although "Bringing Down the

---

the context of the question of whether a trivia quiz book based on the television show, "Seinfeld," infringed the show's copyright. The Second Circuit found that the differences between the two types of works, the quiz book and the television show, made a "quantitative/qualitative" approach to the analysis more appropriate. 150 F.3d at 138. Here, Plaintiff's claim is based on a screenplay that was intended to be made into a movie and is properly assessed by reference to an ordinary observer's likely perception of similarities between the two works.

House" involves a flirtation and includes situations dealing with issues arising from a failed

relationship, no reasonable juror could find that any of the themes of the two works are

substantially similar.

ii.     Total concept and feel

"Amoral Dilemma" is a suspenseful drama which has violent situations, including

discussions of murder, rape, and a car accident. "Bringing Down the House" is a family comedy

featuring silly situational comedy created by the juxtaposition of individuals from different

cultural backgrounds. The total concept and feel of the two works does not demonstrate

substantial similarity.

iii.    Characters

The casts of characters in these two works are vastly different. The protagonist of

"Amoral Dilemma" is a young, white, female attorney, dissatisfied with her work in insurance

litigation and angry about her recently failed relationship with her co-worker and boyfriend. The

protagonist of "Bringing Down the House" is also a white, civil attorney, but he is middle-aged

and the father of two children. He is portrayed as uptight and out of touch with his family given

the pressures of competing with younger, ambitious colleagues. These protagonists could only

viewed as similar at the most vague level of abstraction. Moreover, the portrayal of a dissatisfied

attorney in a competitive job amounts to a "scene a faire" and is a non-protectible general idea,

not the protectible expression of an idea. See Jones v. CBS, Inc., 733 F. Supp. 748, 753

(S.D.N.Y. 1990) ("Basic character types are not copyrightable.")

The prisoners in the two works are also quite different. Charlene is portrayed as a

boisterous black woman who ultimately encourages Peter to "lighten up" and to pay closer

attention to his family. She has a tough, streetwise attitude but also becomes a compassionate friend to Peter and his children. She was convicted after being framed by her boyfriend and by the end of the movie, is exonerated and moves on with her life. The details of Jake Mannion's personality are not well developed in Plaintiff's screenplay, but the screenplay suggests neither that he is particularly warm nor that he would be likely to instill positive life lessons in those he encounters. His dealings with Kelly and Nancy are only illustrated by brief descriptions of their correspondence, and there is an occasional glance into his struggles in prison with his enemy, Gary Satchel.

Neither are the supporting roles in the respective works substantially similar. In "Amoral Dilemma," Kelly's best friend is Nancy, a young advertising executive with a tough attitude and a distrust of men. In "Bringing Down the House," Peter's friend is a macho but fun-loving attorney who humorously uses "urban slang" to try to impress Charlene. The other supporting characters in "Amoral Dilemma" are chiefly Kelly's co-workers, including her secretary, her ex-boyfriend, her boss, and the mail room clerk, as well as characters from the prison and district attorney's office in Pennsylvania. The other supporting characters in "Bringing Down the House" include Peter's children and ex-wife, his potential client, Mrs. Arness, Peter's nosy neighbor, his ex-sister-in-law, various colleagues, and Charlene's ex-boyfriend.

iv.     Plots

The plots of the two works are not substantially similar. In "Amoral Dilemma," Kelly and her friend initiate correspondence with a prisoner as a means to get revenge on men as Kelly becomes increasingly dissatisfied with the moral emptiness of her job. As Kelly continues to succeed in her insurance work, and as Kelly and Nancy become increasingly involved in the

investigation of Jake's crimes, various plot twists continue to reveal violent situations and, at the end of the story, Jake is executed even though he is innocent, Nancy's life is apparently in danger, and Kelly is so disgusted with her job that she is compelled to quit.

In "Bringing Down the House," Peter meets Charlene in an attempt at on-line dating, only to discover she is not who she claimed to be and is in fact quite different from him. Eventually, though, Peter and Charlene are able to help each other; having discovered that Charlene was framed, Peter develops a scheme to exonerate Charlene, Charlene teaches Peter that it is important to enjoy life and that family obligations are more important than work, and Charlene finds romance with Peter's best friend.

v.      Settings

The settings of the two works are not substantially similar either. "Amoral Dilemma" is set in New York City and in a small town in Pennsylvania. The scenes take place at Kelly's law office, Kelly's apartment, a bar, a hospital, the prison, the district attorney's office, and the mail room clerk's apartment. The scenes in "Bringing Down the House" take place in Peter's well-appointed suburban Los Angeles home, Peter's country club, Peter's law firm, an upscale Los Angeles restaurant, and an urban nightclub. Any similarity in the settings of the two movies, such as the fact that both contain scenes set in a law office, are too general to be protectible. See Williams, 84 F.3d at 589 (finding that even though both works involved a dinosaur zoo and both contained electrified fences, automated tours, dinosaur nurseries, and uniformed workers, such elements of settings were "scenes a faire").

vi.      Alleged similarities

In the Complaint, Plaintiff lists twelve "striking similarities" which she asserts can

only be the result of the copyright infringement of her screenplay. (Compl. ¶ 100.) However, even viewed in the light most favorable to Plaintiff, her asserted similarities either involve general non-copyrightable elements that flow from "scenes a faire," or are de minimis such that, even if they are similar, they are not sufficient to establish copyright infringement. Warner Bros., 720 F.2d at 242; see also Zambito v. Paramount Pictures Corp., 613 F. Supp. 1107, 1112 (E.D.N.Y. 1985) (treasure hidden in cave inhabited by snakes, fire used to repel snakes, weary traveler seeking solace in a tavern all too general to be protectible); Smith v. Weinstein, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984) (use of prison rodeo as escape device is non-protectible element).

For instance, Plaintiff asserts in "similarity 2" that:

> The personal lives of both the original and infringing lead character Lawyers are explored in the very beginning of the screenplay, as each is undergoing a break up of a relationship at the same time that each is faced with the prospect of handling the largest case their respective legal departments have ever handled.

(Compl. ¶ 100(2).) There is nothing remotely original about a professional adult dealing with a failed relationship, nor is there anything original about the prospect of a lawyer handling an important case. These plot elements reflect common occurrences in an adult's life and, as such, are not protectible. Moreover, the breakups and work projects arise under different circumstances for each protagonist. Kelly has recently broken up with her boyfriend, Dave, whereas Peter has to contend with a divorce and his relationship with his two children. Kelly litigates an insurance case whereas Peter conducts client development in order to secure Mrs. Arness's corporate business.

Even where certain exchanges of dialogue are similar, as in Plaintiff's "similarity 12" (Kelly quits her job, saying "If anyone calls, I don't work here anymore."; Peter leaves his office, stating " . . . did I tell you? I'm going out on my own."), where, as here, the dialogue

follows from "scenes a faire," it cannot be the basis for a finding of copyright infringement. Denker v. Uhry, 820 F. Supp. 722, 734 (S.D.N.Y. 1992).

            b.      Derivative work claim

        Plaintiff also asserts that the movie is an unauthorized derivative work that had its genesis in her screenplay and that it thus violates her rights under Section 101 of the Copyright Act.  (See generally Pltf's Mem. of Law, at 7-9; Compl. ¶ 114.)  A derivative work is one that is substantially copied from a prior work and is in the nature of a translation, dramatization, fictionalization, or other form in which a work is recast, transformed, or adapted.  Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp., 354 F.3d 112, 116 (2d Cir. 2003) (citing 17 U.S.C. § 101); Reyher v. Children's Television Workshop, 533 F.3d 87, 90 (2d Cir. 1976).  Here, Plaintiff asserts that she wrote a screenplay which she intended to be made into a movie and that Defendants plagiarized elements of her screenplay to create another screenplay which became the script for a motion picture.  Because the Court finds that the two works are not substantially similar, it necessarily follows that "Bringing Down the House" is not a work derivative of Plaintiff's screenplay within the meaning of Section 101.


            3.      Lanham Act Claim

        Defendants also move for summary judgment on Count Five of the Complaint, which alleges that Defendants made a false and misleading designation as to the origin of "Bringing Down the House" by failing to credit Plaintiff with authorship in violation of Section 43(a) of the Lanham Act.  (Compl. ¶¶ 155-65); 15 U.S.C.A. §§ 1117, 1125(a) (West 1998).  To prevail on a claim for unfair competition under § 43(a) of the Lanham Act, a plaintiff must prove

that (1) the work at issue originated with the plaintiff; (2) the origin of the work was falsely designated by the defendant; (3) the false designation of origin was likely to cause consumer confusion; and (4) the plaintiff was harmed by the defendant's false designation of origin. Lipton v. The Nature Co., 71 F.3d 464, 473 (2d Cir. 1995). In light of the Court's determination that the movie is not substantially similar to Plaintiff's screenplay, the Lanham Act claim with regard to the movie must also be dismissed. The movie did not originate with Plaintiff, and there can be no consumer confusion given the lack of substantial similarity. See Walker,784 F.2d at 52-53; Jones, 733 F. Supp. at 754.

To the extent, however, that Plaintiff maintains that Defendant Filardi's draft screenplays originated from "Amoral Dilemma" and/or that her work was falsely designated as his own in the pitch and sale of the screenplay, the motion for summary judgment as to Count Five is denied.

4.      Preemption of State Law Claims

Defendants move to dismiss several of Plaintiff's state law claims, arguing that they are expressly preempted by Section 301(a) of the Copyright Act. A state law claim is preempted by the Copyright Act where (1) the work to which the claim is applied falls within the scope of works protected by sections 102 or 103 of the Copyright Act, and (2) the claim addresses legal or equitable rights already protected by copyright law. Sharp v. Patterson, No. 03 Civ. 8772 (GEL), 2004 WL 2480426, at *6 (S.D.N.Y. Nov. 3, 2004) (citing Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004)).

Plaintiff's claims for unfair competition under California Business and

Professional Code § 17200 (Count Ten), and her New York common law claims of unfair competition (Count Eleven), unjust enrichment (Count Fourteen), and quantum meruit (Count Fifteen) are thus preempted to the extent they address precisely the same issues as her copyright claims relating to "Bringing Down the House" and the screenplay drafts.  See Hudson v. Universal Pictures Corp., No. 03-CV-1008 (FB)(LB), 2004 WL 1205762, at *4 (E.D.N.Y. Apr. 2, 2004).

However, to the extent these claims are premised on notions or claims of violations of rights that are outside the ambit of copyright law, they are not preempted.  In these counts, Plaintiff complains, for example, of misappropriation of "her idea" (e.g. Compl. ¶¶ 205, 217), and misrepresentations concerning misappropriation of her "confidential and proprietary original ideas and concepts" (Id. ¶ 252) and of her "original ideas and concepts" in connection with the "pitch" of the same.  (Id. ¶ 262.)  Without commenting on the viability of the state law claims to the extent they fall outside the range of rights protected by the Copyright Act, the Court finds that they are not, to the extent they seek the protection of ideas rather than of copyrightable expressions of ideas, preempted.  Cf. Smith, 578 F. Supp. at 1307 (finding that plaintiff's allegation that defendant created express or implied contract to pay plaintiff for value of his ideas was not preempted because contract claim was qualitatively different from copyright claim insofar as a party may agree to pay for ideas that are not protected by copyright law).  Accordingly, Counts Ten, Eleven, Fourteen, and Fifteen are dismissed only to the extent they are premised on rights protected by the Copyright Act.

5.      Fraud Claim

Defendants also move for summary judgment as to Count Twelve, fraud, which is asserted solely against Defendants Filardi, Tobia, and B&L.  Defendants' evidentiary proffers on the motion for summary judgment relate only to the question of similarity or lack thereof between Plaintiff's screenplay and the finished film, but Plaintiff's fraud claims go to statements that Filardi, Tobia, and B&L allegedly made with respect to Filardi's draft, then entitled "Jailbabe.com."  The Moving Defendants are not entitled to judgment as a matter of law on Count Twelve based on the current record before the Court, and their motion is denied as to that Count.

6.      Declaratory and Injunctive Relief

Counts Sixteen and Seventeen seek declaratory and injunctive relief, respectively, for Plaintiff's copyright and related claims but are labeled as separate causes of action.  Neither of these claims is properly brought as a separate cause of action.  Rather, they seek remedies for substantive claims.  Counts Sixteen and Seventeen are therefore duplicative of the substantive claims and are dismissed as separate causes of action.  <u>Smith v.New Line Cinema</u>, No. 03 Civ. 5274 (DC), 2004 WL 2049232, at * 5 (S.D.N.Y. Sept. 13, 2004).

7.      Plaintiff's Rule 56(f) Application

Plaintiff, in her response to the motions for summary judgment, also makes an application, pursuant to Federal Rule of Civil Procedure 56(f), for a continuance to allow her to obtain discovery prior to the Court's ruling on the motion for summary judgment.  Plaintiff has failed to establish that there is any material issue as to which additional discovery is needed in

order for the Court to decide the instant motion for summary judgment.  Because the relevant

inquiry for summary judgment on the copyright and related claims regarding the movie focuses on

the substantial similarities between Plaintiff's screenplay and Defendants' finished film, both of

which are in evidence, the Court finds that there is sufficient evidence upon which to decide

Defendants' motion for partial summary judgment and that Plaintiff does not require additional

discovery to enable her to respond to the material elements of Defendants' factual proffer or

otherwise secure facts essential to justify her opposition.  Accordingly, Plaintiff's Rule 56(f)

application is denied.

III.

CONCLUSION

For the reasons explained above, the pending applications are resolved as follows.

The application of Defendants Amritraj, Hoberman, and Lieberman for a stay of their obligation

to answer the First Amended Complaint pending adjudication of the partial summary judgment

motions is granted, and Plaintiff's cross-motion to require an immediate answer by those

Defendants is denied.  The parties are directed to make supplemental submissions in connection

with Plaintiff's application for an award of fees and expenses pursuant to Rule 4(d)(5) of the

Federal Rules of Civil Procedure as follows.  Plaintiff shall file and serve, within 30 days from the

date hereof, a **concise** affidavit summarizing the timing of her efforts to serve these defendants,

the expenses incurred in connection therewith, and her expenses incurred in connection with this

motion practice; Plaintiff shall provide copies of the requests for waiver showing the time frame

she allotted for response.  Defendants Amritraj, Hoberman, and Lieberman shall file and serve any

objections to the amounts of expenses requested within ten days of receipt of Plaintiff's

submission, and Plaintiff shall file and serve any reply within five days of receipt of Defendants' objections.

Plaintiff's objections to Judge Pitman's September 24, 2003, and June 29, 2004, orders are overruled.  Plaintiff's motions to strike the declaration of Jeffrey A. Conciatori in support of the motion for partial summary judgment and Mr. Conciatori's February 6, 2004, letter are denied.

The Moving Defendants' motions for summary judgment are granted, and Counts One through Four of the First Amended Complaint are dismissed as against them, insofar as Plaintiffs' claims are premised on alleged similarities between her screenplay and the finished film "Bringing Down the House."  Count Five is dismissed as against the Moving Defendants insofar as it asserts that Defendants have falsely designated the origin of the finished film.  Counts Ten, Eleven, Fourteen and Fifteen are dismissed as against the Moving Defendants to the extent they are premised on rights protected by the Copyright Act.  The Moving Defendants' motions to dismiss Counts Sixteen and Seventeen are granted as well.  The Moving Defendants' partial summary judgment motions are denied in all other respects.

Defendants Amritraj, Hoberman, and Lieberman shall answer the surviving aspects of the First Amended Complaint within fourteen days from the date hereof.

The parties shall promptly contact Judge Pitman's chambers to schedule a conference concerning further pre-trial activity with respect to Plaintiff's surviving claims.

SO ORDERED.

Dated: New York, New York
September 14, 2005

LAURA TAYLOR SWAIN
United States District Judge