UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIE FLAHERTY,

                    Plaintiff,

          -v-                                    No. 03 Civ. 2167 (LTS)(HBP)

JASON FILARDI, GEORGE N. TOBIA, JR.,
BURNS AND LEVINSON, LLP, HYDE PARK
ENTERTAINMENT, ASHOK AMRITRAJ,
DAVID HOBERMAN, TODD LIEBERMAN,
THE WALT DISNEY COMPANY, BUENA VISTA
MOTION PICTURES GROUP, TOUCHSTONE
PICTURES, BUNGALOW 78 PRODUCTIONS,
THE KUSHNER-LOCKE COMPANY, MEESPIERSON
FILM CV, WMG FILM, JANE BARTELME, COOKIE
CAROSELLA, DANA OWENS d/b/a/ QUEEN
LATIFAH, 7th CAVALRY PRODUCTIONS, INC.,
BIG HOUSE PRODUCTIONS,INC., WRITERS GUILD
OF AMERICA, WEST, PETER FILARDI, WALT DISNEY
ENTERPRISES and DOES 6 THROUGH 10, inclusive,

                    Defendants.

_____

OPINION AND ORDER

          Plaintiff Marie Flaherty ("Plaintiff" or "Flaherty"), appearing pro se, brings this

action, alleging principally that Defendants Jason Filardi ("Filardi"), George N. Tobia, Jr., Esq.

("Tobia"), Burns and Levinson, LLP ("B&L"), Hyde Park Entertainment ("Hyde Park"), Ashok

Amritraj ("Amritraj"), David Hoberman ("Hoberman"), Todd Lieberman ("Lieberman"), the

Walt Disney Company ("Disney"), Buena Vista Motion Pictures Group ("Buena Vista"),

Touchstone Pictures ("Touchstone"), Bungalow 78 Productions ("Bungalow 78"), the Kushner-

Locke Company ("Kushner-Locke"), Meespierson Film CV ("Meespierson"), WMG Film

("WMG"), Jane Bartelme ("Bartelme"), Cookie Carosella ("Carosella"), Dana Owens d/b/a

Queen Latifah ("Owens"), 7th Calvalry Productions, Inc. ("7th Calvalry), Big House Productions,

Inc. ("Big House"), Peter Filardi ("Peter Filardi"), Writer's Guild of America West (the "Guild"),
Walt Disney Enterprises, Inc. ("Disney Enterprises"), and Does 6-10 (collectively,
"Defendants")[1] infringed Plaintiff's copyright in her screenplay, Amoral Dilemma, in creating the
motion picture Bringing Down the House, in violation of 17 U.S.C. § 101 et seq.

By Opinions and Orders entered September 16, 2005 (the "September 2005
decision"), and September 19, 2007 (the "September 2007 decision"), the Court granted
summary judgment in Defendants' favor on the vast majority of Plaintiff's copyright, Lanham
Act and state law claims.  Among other things, the Court found that the motion picture Bringing
Down the House was not violative of Plaintiff's copyright in her Amoral Dilemma screenplay, in
that the motion picture is not substantially similar to Plaintiff's work.  Flaherty v. Filardi, 388 F.
Supp. 2d 274, 287-290 (S.D.N.Y. 2005).  The Court also held that many of Plaintiff's state law
claims were preempted by federal copyright law.  Id. at 290-91; Flaherty v. Filardi, No. 03 Civ.
2167, 2007 WL 2734633 at *6-7 (S.D.N.Y. Sep. 19, 2007).

In its September 2007 decision, the Court was unable to resolve the motions for
summary judgment relating to what appeared to be Plaintiff's claim that Defendants Tobia and
Filardi had violated Plaintiff's intellectual property rights by selling to the Disney interests, in the
guise of a screenplay, Jailbabe.com, purportedly written by defendant Filardi, Plaintiff's work
Amoral Dilemma.  The Court directed the parties to make further submissions as to the identity
and nature of the Jailbabe.com work that was sold to the Disney interests.  Defendants'

---

[1]      Defendants Disney, Buena Vista, Touchstone, Hyde Park, Jason Filardi, Amritraj,
Hoberman, Lieberman and Owens are referred to collectively as the "Disney
Defendants," Defendants Tobia and B&L are referred to collectively as the "B&L
Defendants," and Big House, Disney Enterprises, and 7th Calvalry are referred to
collectively as the "Big House Defendants."

submissions in response to the order for supplemental briefing include uncontroverted evidence that the Jailbabe.com work in question was the Jailbabe.com screenplay that was attached as Exhibit H to the Conciatori Declaration, submitted in support of the Disney Defendants' motion for summary judgment filed on September 29, 2006 (the "Conciatori Declaration") (this version of the work is referred to in this Opinion as "JAILBABE.COM").  Concurrently with the issuance of the September 2007 decision, the Court also issued an order to show cause directing Plaintiff to demonstrate why the action should not be dismissed against all of the remaining Defendants, given the Court's determinations as to preemption and lack of substantial similarity, "in light of the fact that Plaintiff's Second Amended Complaint asserts the same, or substantially similar, copyright, Lanham Act and/or common law causes of action against the remaining Defendants."  (Docket Entry No. 255.)

This Opinion and Order addresses that portion of the Defendants' summary judgment motion relating to JAILBABE.COM, as well as: Plaintiff's motion for reconsideration of the Court's September 2007 decision, and the Disney Defendants' application for sanctions in connection therewith; Plaintiff's response to the Court's September 17, 2007, Order to Show Cause; the Guild's motion to dismiss the Complaint, which was held in abeyance pending submissions on the Order to Show Cause; Plaintiff's cross-motion for summary judgment, filed in response to the Guild's motion to dismiss; Plaintiff's objections to Magistrate Judge Pitman's Opinions and Orders dated August 14, 2007, and September 12, 2008; the Disney and B&L Defendants' request for sanctions in connection with Plaintiff's objections to Judge Pitman's decisions; and the Disney and B&L Defendants' request to strike Plaintiff's response to that request for sanctions.

The Court has subject matter jurisdiction of Plaintiff's copyright and Lanham Act claims pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1338(b), and of the state law claims pursuant to 28 U.S.C. § 1367.

The Court has reviewed thoroughly and considered carefully all of the submissions made in connection with these matters.  The pending matters are resolved as follows.  Filardi and Tobia's motion for summary judgment with regard to the sale of the work JAILBABE.COM, which was held in abeyance pending further submissions, is granted. Plaintiff's motion for reconsideration and the Disney Defendants' related application for sanctions are denied.  Plaintiff's remaining claims are dismissed against all remaining Defendants.  The Guild's motion to dismiss is denied as moot in light of the Court's decision on the Order to Show Cause; Plaintiff's cross-motion for summary judgment is denied.  Plaintiff's objections to Judge Pitman's decisions are overruled; the Disney and B&L Defendants' application for sanctions against Plaintiff pursuant to 28 U.S.C. § 1927 in connection with her objections is denied, and their motion to strike Plaintiff's response to that application is granted.

Familiarity with the background of the instant case, which is detailed in the Court's September 2005 and September 2007 decisions, is presumed.  See Flaherty v. Filardi, 388 F. Supp. 2d 274 (S.D.N.Y. 2005); Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 2734633 (S.D.N.Y. Sep. 19, 2007). _____

DISCUSSION

_____I.    Filardi and Tobia's Summary Judgment Motion with Respect to
                  JAILBABE.COM

As explained in the September 2007 decision, Plaintiff appears to assert a claim

that Defendants Tobia and Filardi sold to Disney interests[2] a screenplay, JAILBABE.COM, that either was actually Plaintiff's Amoral Dilemma screenplay or was so similar to Amoral Dilemma as to infringe on Plaintiff's protective rights in that work.  In her briefing on her motion for reconsideration and in response to the Order to Show Cause, Plaintiff appears to elaborate on earlier suggestions that, after the sale, Defendants inserted protected elements of Amoral Dilemma into JAILBABE.COM and other draft screenplays that were eventually developed into the motion picture Bringing Down the House.  The claim relating to other screenplays will be addressed in the section of this opinion relating to the Order to Show Cause.  This section addresses Plaintiff's claim insofar as it is focused specifically on JAILBABE.COM.  The Court has considered thoroughly all of the parties' supplemental submissions on this issue.

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, the facts will be viewed in the light most favorable to the party opposing the motion and all reasonable inferences will be drawn in the non-movant's favor.  Consarc Corp. v. Marine Midland Bank., N.A., 996 F.2d 568, 572 (2d Cir. 1993).  A fact is material in the context of a motion for summary judgment "if it 'might affect the outcome of the suit under the governing law.'"  Holtz v. Rockefeller & Co., 258 F.3d

---

[2]    In the supplemental briefing on this issue, Plaintiff purports to identify issues of fact as to which of the Disney entities purchased the screenplay.  To the extent that there are genuine issues of fact on this question, they are immaterial to the resolution of the motion because, as explained below, Plaintiff has failed to meet her burden of demonstrating that JAILBABE.COM, as sold to the Disney interests, infringed her federally-protected copyright or other intellectual property interests.

62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A

'genuine' issue of fact arises if "the evidence is such that a reasonable jury could return a verdict

for the non-moving party."  Id.  In opposing a motion for summary judgment, the non-moving

party must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

56(e)(2).  "[M]ere conclusory allegations, speculation or conjecture," will not provide a sufficient

basis for a non-moving party to resist summary judgment.  Cifarelli v. Vill. of Babylon, 93 F.3d

47, 51 (2d Cir. 1996).

## A. Copyright Claim

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid

copyright; and (ii) unauthorized copying of the copyrighted work."  Jorgensen v. Epic/Sony

Records, 351 F.3d 46, 51 (2d Cir. 2003).  Plaintiff must show that his work " was 'copied,' by

proving access and substantial similarity between the works, and also show that his expression

was 'improperly appropriated,' by proving that the similarities relate to copyrightable material."

Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986).  Not all copying constitutes

copyright infringement.  As the Second Circuit has repeatedly recognized, "[i]t is an axiom of

copyright law that the protection granted a copyrightable work extends only to the particular

expression of an idea and never to the idea itself."  Reyher v. Children's Television Workshop,

533 F.2d 87, 90 (2d Cir. 1976).  Furthermore, "[s]imply because a work is copyrighted does not

mean every element of that work is protected."  Boisson v. Banian, Ltd, 273 F.3d 262, 268 (2d

Cir. 2001).  Summary judgment is appropriate in an action for copyright infringement where the

relevant similarity concerns only non-copyrightable elements of Plaintiff's work or if no

reasonable factfinder could find the works substantially similar.  Id.

Plaintiff claims that JAILBABE.COM is substantially similar to Amoral Dilemma with respect to copyrightable elements of the latter.  Plaintiff also argues that certain Defendants' admissions of access and copyright validity in connection with the initial summary judgment motion preclude them from contesting those issues for purposes of this summary judgment motion practice and at any trial, and necessarily raise genuine issues of material fact regarding copying.

In determining whether two works are substantially similar, the Court uses an "ordinary observer test."  Under the ordinary observer test, "the necessary inquiry is 'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work,'" Kaplan v. Stock Market Photo Agency, Inc., 133 F. Supp. 2d 317, 322 (S.D.N.Y. 2001) (quoting Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir.1966).)  The Court considers "similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting" of the two screenplays.  Williams v. Crichton, 84 F.3d 581, 588 (2d Cir. 1996.  In evaluating two works for similarities, "scenes a faire, sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection."  Id. at 587 (internal quotations omitted).

The Court compares Plaintiff's Amoral Dilemma[3] and JAILBABE.COM to determine whether Defendants have demonstrated that they are entitled to summary judgment as a matter of law because JAILBABE.COM is not substantially similar to Amoral Dilemma's protectible elements.

---

[3]     In conducting its analysis, the Court uses the copy of Amoral Dilemma attached to the Conciatori Declaration as Exhibit B.  (See Disney Defendants' 56.1 Stmt. ¶ 1; Plaintiff's Response.)

1.  JAILBABE.COM and Amoral Dilemma: The Allegedly Similar Screenplays

a)      Amoral Dilemma

        The Court has previously provided a thorough description of Plaintiff's Amoral

Dilemma in its September 2005 decision.  Familiarity with that opinion is presumed.  See

Flaherty v. Filardi, 388 F. Supp 2d 274, 279-80 (S.D.N.Y. 2005).

b)      JAILBABE.COM

        JAILBABE.COM opens with Peter Potts, a socially awkward, 33-year-old white,

male "loser" landscaping his elderly neighbor's lawn.  He has trouble talking to his neighbor's

beautiful granddaughter, Kate, and turns down a dinner invitation from Kate to go home and eat

with his parents.  On his way back to his apartment, located over his parents' garage, Peter is

confronted by the 12-year-old town bully who wants to take over Peter's lawn job.  Lonely and

unsuccessful with women, Peter has been corresponding with Chastity, a female inmate, through

the website "Jailbabes.com."  Although Peter intends to end their correspondence, Chastity

escapes from prison before he can.  After escaping, Chastity heads towards Peter's home.

        Peter's prurient parents are concerned that Peter is gay and try to set him up with a

prostitute.  Peter and his best friend Lucky bemoan their luck with women and social status, and

Peter is forced to surrender the job he loves to the town bully.  Chastity shows up at Peter's

apartment claiming that she has been released.  After discovering that Peter had intended to end

their correspondence, Chastity gets upset and Peter has to convince her not to leave.  With

Lucky's encouragement, Peter decides to help Chastity get back on her feet.  Lucky gives her a

job in his bagel store, Peter arranges for a new haircut and clothing for Chastity and tries (with

only limited success) to stop her from engaging in any illegal activities.

While Peter tries to help Chastity, the authorities are searching for her.  The town's chief-of-police is suspicious of Chastity, despite the new name she is using – Julia Smith – and her changed appearance.  Peter's parents, however, are thrilled that he has a found a woman.  In Chastity's company, Peter and Lucky are finally able to get into the local nightclub.  At the club, Kate sees Peter and Chastity together.  Unfortunately, Peter cannot handle the alcohol and oversleeps, losing his new job as a mailman before he even starts.  After a confrontation with someone from Chastity's past, Widow, and Chastity's disappointment at Peter's inability to stand up to the 12-year-old bully, Peter and Chastity have sex.  Although this disturbs the local priest, who overhears the noise, Peter's parents are thrilled to discover that he is not gay.  Peter and Chastity become closer and Peter shares his lifelong dream of opening his own landscaping business.  Peter is even able to successfully stand up to Widow during a second confrontation.

Meanwhile, the authorities are closing in.  Chastity flees with Peter's savings but then returns with the money, realizing that she is a changed person.  As the FBI approaches Peter's home, Chastity confesses that she has actually escaped from prison.  In a climactic firefight, Peter and Chastity lead the authorities on a car chase and eventually escape to Lucky's boat by pretending that Peter is a hostage.  Unfortunately the SWAT team shoots the boat's gas tank and it explodes.  Peter, tossed out into the water, survives, and as a "hostage," does not appear to face any legal repercussions.  Instead, his experience gives him the resolve necessary to face down the 12-year-old bully.  As the screenplay concludes, a newly-confident Peter has successfully opened his dreamed-of landscaping business, employing the bully and his posse, and Peter and Kate have finally gotten together.  In the final scene, Chastity, having survived the boat

explosion, makes it to Holland and meets (presumably) another internet lover.

2.  Infringement Analysis

          For the following reasons the Court, after a thorough review of Plaintiff's <u>Amoral Dilemma</u> and the allegedly infringing <u>JAILBABE.COM</u>, finds that no reasonable trier of fact could find the works substantially similar with respect to any protectible elements of <u>Amoral Dilemma</u>.  Defendants are, accordingly, entitled as a matter of law to summary judgment in their favor as to Plaintiff's copyright claim based on the allegedly infringing nature of <u>JAILBABE.COM</u>.  In light of its conclusions regarding substantial similarity, the Court need not reach the issues of access and copyright validity.

a)    <u>Alleged Similarities</u>

          Plaintiff identifies alleged similarities between <u>Amoral Dilemma</u> and <u>JAILBABE.COM</u> in her November 20, 2006, Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and testified about alleged similarities during her deposition.  All of the alleged similarities, however, relate to unprotectible ideas, constitute classic scenes a faire, or are de minimis.

          Plaintiff claims that the infringement of <u>Amoral Dilemma</u> is evidenced by the fact that both works' plots involve "a protagonist loser in love casually looking for a social substitute from an on-line source who ends up becoming increasingly involved in the legal plight of the prisoner and who goes through a series of emotional experiences affecting the Lead Character's personal and professional life after corresponding with the Prisoner."  (Pl's Nov. 20, 2006, Mem. in Opp. pp. 17-18.)  Even assuming that this is an accurate description of the plots of the two works, any resemblance between the plots at this level is limited to uncopyrightible general

concepts.  As the Court held in its September 2005 decision, "[t]here is nothing remotely original about a professional adult dealing with a failed relationship."  <u>Flaherty v. Filardi</u>, 388 F. Supp. 2d 274, 289 (S.D.N.Y. 2005).

_____The alleged similarities between characters, events and locations are equally unprotectible.  Even where Plaintiff's abstract plot description suggests the presence of material similarities, close examination of the works reveals that any such alleged similarities are illusory.  For example, Plaintiff alleges that the works are similar because the lead characters in both are Caucasian and that both the lead characters and their respective best friends are in their late twenties to early thirties.  However, as the comparison of the characters below reveals, the characters in the two works are dissimilar in nearly every way other than the unprotecible characteristics of age and race.  None of Plaintiff's alleged similarities survive the most superficial of examinations.

b)    <u>Themes</u>

The principal themes of the two works are not substantially similar.  In <u>Amoral Dilemma</u>, the principal theme is of a young attorney's dissatisfaction with her legal practice and the corruption of the legal system, revealed through her civil practice and through her experiences with the prison and prosecutorial offices that she encounters.  The screenplay also addresses a woman's attempt to deal with a failed relationship and the desire to take revenge on men.

The principal theme in <u>JAILBABE.COM</u> is of a frequently bullied "loser" learning to stand up for himself.  In trying to help a tough, violent prisoner get back on her feet, the good-hearted, if socially awkward, protagonist becomes more confident in himself and is

eventually able to succeed in his work and professional life.

c)    <u>Total Concept and Feel</u>

The two works are not substantially similar in total concept and feel.  <u>Amoral Dilemma</u>, is a dark, suspenseful drama involving violent situations, including a murder and car accident, with a cliffhanger ending.  <u>JAILBABE.COM</u> is a raunchy comedy filled with scatological and physical humor, sex, and sexual innuendo.  Although there is some violence in <u>JAILBABE.COM</u>, the violence has a comedic element: Peter being attacked by roosters, Peter being beaten up in front of a group of elderly Japanese tourists, a firefight between FBI agents and Peter and Chastity in which the agent in charge is accidentally attacked by his own men.  The screenplay wraps up happily, with Peter achieving everything that he has dreamed of and Chastity's successful escape.

d)    <u>Characters</u>

The protagonist of <u>Amoral Dilemma</u> is a white, female attorney in her late twenties who is dissatisfied with her work and angry about her failed relationship with her co-worker boyfriend.  In contrast, the protagonist of <u>JAILBABE.COM</u>, Peter Potts, is a 33-year-old socially awkward male who tends lawns for a living, lives above his parents' garage and loves his work.  There is no similarity between the two protagonists at even the most abstract level.

Neither are the prisoners in the two works substantially similar.  In <u>Amoral Dilemma</u> Jake, whose personality details are not well developed, is a white, male prisoner who is frequently bullied by another prisoner.  Jake appears to be innocent of the crime of which he was convicted.  Chastity, the prisoner in <u>JAILBABE.COM</u>, is a tough, white, female.  Despite her vulgarity, violence and sex-centered attitude, she seems to care for Peter in her own way and

encourages him to stand up for himself.  Nothing in the screenplay suggests that she was wrongly imprisoned.

The casts of supporting characters in these two screenplays also lack any substantial similarity.  In <u>Amoral Dilemma</u>, Kelly's best friend is a young, tough, female advertising executive who distrusts men.  In <u>JAILBABE.COM</u>, Peter's best friend is another social outcast, a similarly-aged male with a facial birthmark, cauliflower ear and a lisp, who owns a bagel store.  The other supporting characters in <u>Amoral Dilemma</u> consist mostly of Kelly's co-workers.  In <u>JAILBABE.COM</u>, the other supporting characters include Peter's parents, someone from Chastity's past, an FBI agent and various individuals from Peter's suburban community, including the town bully, postmaster, chief of police, a priest, and nightclub bouncer.

e)      <u>Plot</u>

The plots of the two works are not substantially similar.  In <u>Amoral Dilemma</u>, Kelly and her friend correspond with a prisoner as a means of seeking revenge on men.  Kelly continues to succeed at her job, but becomes increasingly dissatisfied with the moral emptiness of her work.  As the two women become increasingly involved in investigating Jake's innocence, violent and dangerous situations are developed through various plot twists.  At the conclusion of the screenplay, the innocent Jake is executed, Nancy's life appears to be in danger and Kelly quits her job.

In <u>JAILBABE.COM</u> Peter, a social outcast, corresponds with a prisoner because he has trouble approaching women.  Although Peter loves his job caring for lawns, he is forced to give it up by a 12-year-old bully.  After Chastity escapes from prison and shows up at Peter's

home, Peter tries to help her get back on her feet.  Although Chastity's arrival causes Peter some problems, including losing his new job, getting into several fights, and having to play hostage, Chastity encourages Peter to stand up for himself and Peter eventually develops the necessary confidence.  At the conclusion of the screenplay, Chastity has escaped to Holland and (presumably) another internet lover, and Peter has beaten the town bully in a contest, is able to open his own business and gets the beautiful girl that he's been interested in all along.

f)      Sequence

The sequence of events in the two works is also dissimilar.  In Amoral Dilemma, Kelly breaks up with her co-worker David; Kelly and Nancy start contacting a death row inmate; Kelly is assigned to be lead attorney on her firm's big new case; David is stabbed by an unidentified man; Kelly and Nancy discover a dead body; Kelly and Nancy go to Pennsylvania to investigate Jake's innocence; Nancy visits Jake in prison; Kelly quits her job; the wrong prisoner is released and heads to Nancy's home; and Jake is executed.  In JAILBABE.COM, Peter meets Kate; he is harassed by the town bully; Chastity escapes from prison; Peter walks in on his parents having sex; Peter gets into a fight with roosters; Chastity gets into a fight at the club; Peter loses his new job; Peter gets into a fight with Widow; Peter and Chastity have sex; Chastity flees with and then returns Peter's savings; the authorities attack Peter's home looking for Chastity; and Peter and Chastity escape.  This order of events does not resemble the sequence in Amoral Dilemma.

Additionally, in Amoral Dilemma, Plaintiff relies extensively on the use of flashbacks and dream montages/sequences.  In doing so, Amoral Dilemma conflates the real and the imaginary and allows characters to speculate on events of which they have no first-hand

knowledge.  In contrast, JAILBABE.COM unfolds in a more linear trajectory and the few

flashback scenes consist of Peter remembering experiences from his childhood.

g)     Setting and Pace

        Amoral Dilemma is set in New York City and a small Pennsylvania town.  The

scenes take place in Kelly's workplace and at her apartment, in a bar, a hospital, the prison, the

district attorney's office, and the mail room clerk's apartment.  JAILBABE.COM is set in a

nondescript suburb.  Many of the scenes take place outside or on someone's lawn or in Peter's

place over his parents' garage.  There are also scenes in Peter's parents' house, the prison, Peter's

best friend's bagel store, a diner, and a nightclub.  To the extent that there is overlap – for

example, the fact that both involve prison scenes – the similarity is too general to be protectible;

prison scenes are to be expected in screenplays involving prisoners.

        Furthermore, Amoral Dilemma incorporates more subplots and jumps around

more, moving quickly from scenes in the main plot to those in the subplot and shifting frequently

between different physical perspectives.  JAILBABE.COM focuses on the one main plot – life

from the perspective of the protagonist Peter Potts, and is slower-moving.  To the extent that

there is a similarity in pace, "[w]ithout more, however, such similarity is insufficient to create an

issue of overall substantial similarity between the works."  Williams v. Crichton, 860 F.Supp.

158, 168 (S.D.N.Y. 1994).

        The Court finds that, when both works are viewed in the light most favorable to

the Plaintiff, the ordinary observer viewing both screenplays would not recognize the

Defendants' JAILBABE.COM as having been appropriated from the Plaintiff's Amoral

Dilemma; the two works are not substantially similar with respect to protectible elements of

Plaintiff's screenplay.  Summary judgment is granted in favor of Tobia and Filardi on Plaintiff's copyright claims as to <u>JAILBABE.COM</u>.

B. Lanham Act Claim

In its September 2007, decisions, the Court deferred the question of "the viability of any Lanham Act claim premised on Plaintiff's assertion that Filardi and Tobia sold her screenplay, in the guise of Filardi's 'Jailbabe.com,'" pending further submissions from the parties.  <u>Flaherty v. Filardi</u>, No. 03 Civ. 2167, 2007 WL 2734633, at *5 (S.D.N.Y. Sept. 19, 2007).  Having received the supplemental submissions authenticating the screenplay <u>JAILBABE.COM</u>, which was previously submitted to the Court, as the one that Filardi sold, the Court now grants summary judgment in Defendants' favor on Plaintiff's remaining Lanham Act claim.

The analysis in the preceding sections establishes that no substantial similarity between <u>JAILBABE.COM</u> and <u>Amoral Dilemma</u> exists.  Had Filardi merely changed the cover page of the script to list himself as author and provide a new title, Plaintiff might have had a Lanham Act claim.  <u>See</u> <u>Dastar Corp. v. Twentieth Century Fox Film Corp.</u>, 539 U.S. 23 (2003) (the Lanham Act protects only the producer of the tangible goods that are offered for sale); <u>see also</u> <u>A Slice of Pie Productions, LLC v. Wayans Bros. Entertainment</u>, 392 F. Supp. 2d 297, 313 (D. Conn. 2005) (if defendants had merely repackaged videos of plaintiff's movie as defendant's film, and offered them for sale to the public, plaintiff would have had a Lanham Act claim).  However, Plaintiff's failure to raise a genuine issue of material fact as to any substantial similarity between the two works is fatal to Plaintiff's claim that Filardi passed off her screenplay as his own under a different name.  As the Supreme Court held in <u>Dastar</u>, the Lanham Act

protects only "the producer of the tangible goods that are offered for sale, and not . . . the author

of any idea, concept, or communication embodied in those goods." Dastar, 539 U.S. at 37.

Defendants Filardi and Tobia are therefore entitled to summary judgment on Plaintiff's Lanham

Act claim as to Filardi's sale of JAILBABE.COM.

    II.      Plaintiff's Motion for Reconsideration

A.  Plaintiff's Arguments

Plaintiff moves pursuant to Rule 59(e) and Local Civil Rule 6.3 for

reconsideration of the Court's September 2007 decision granting summary judgment in favor of

the Disney and B&L Defendants.

Under Federal Rule of Civil Procedure 59(e), the party moving for reconsideration

has a heavy burden.  The standard for reconsideration is strict, and "reconsideration will

generally be denied unless the moving party can point to controlling decisions or data that the

court overlooked - matters, in other words, that might reasonably be expected to alter the

conclusion reached by the court." Shrader v. CSX Transportation, Inc., 70 F.3d 255, 256-257 (2d

Cir. 1995).  "[A] motion to reconsider should not be granted where the moving party seeks

solely to relitigate an issue already decided." Id.  Courts construe Rule 59(e) narrowly and apply

it strictly in order "to avoid repetitive arguments on issues that have been fully considered by the

court." Anglo American Ins. Group v. Calfed Inc., 940 F. Supp. 554, 557 (S.D.N.Y. 1996).

Additionally, the movant must demonstrate that "the Court has overlooked controlling decisions

or factual matters that were put before it on the underlying motion . . . and which, had they been

considered, might have reasonably altered the result before the court." Range Road Music, Inc.

v. Music Sales Corp., 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000) (emphasis and alteration in

original, citation and internal quotation marks omitted).  The same standard governs motions for

reconsideration made pursuant to S.D.N.Y. Local Civil Rule 6.3.  In re Otal Investments Ltd.,

No. 03 Civ. 4303, 2006 WL 895212, at *1 (S.D.N.Y. Apr. 7, 2006).

        Plaintiff raises a number of arguments in her motion for reconsideration.  The

Court has reviewed all of them thoroughly and concludes that none of Plaintiff's arguments

meets the strict standard necessary to demonstrate grounds for reconsideration.  Plaintiff's

arguments consist of attempts to relitigate issues that the Court has already decided, raise issues

not previously put before the Court on the underlying motion, and invoke authority that is

irrelevant or would not have altered the Court's decision.  Only a few of Plaintiff's arguments

warrant further discussion here.

        Plaintiff reiterates her oft-repeated complaints about the nature and quantum of

discovery materials she obtained in the course of this litigation, asserting that, in the September

2007 decision, the Court overlooked controlling law in with respect to her due process rights and

discovery as laid out in her 56(f) Declaration, however, Plaintiff does not identify any such

controlling law.  Insofar as Plaintiff is now requesting additional discovery, reopening of

discovery or is claiming that there are outstanding requests for discovery, the Court noted in the

September 2007 decision that discovery in the case is closed and stated that applications for

reopening discovery or for supplemental discovery would not be considered.  Flaherty v. Filardi,

No. 03 Civ. 2167, 2007 WL 2734633 at n. 9 (S.D.N.Y. Sep. 19, 2007).  Plaintiff's failure to

pursue discovery or press discovery-related complaints while discovery was open does not

constitute an appropriate ground for reconsideration of the Court's summary judgment decision.

See Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 2398762, at *2 (S.D.N.Y. Aug. 15, 2007)

(Denying Plaintiff's request to extend discovery because "Plaintiff has not shown that her failure to complete discovery was anyone's fault but her own" and "[P]laintiff did not diligently utilize the time available to her to complete discovery, [so] there is no reason to extend that time."); see also Flaherty v. Filardi,  No. 03 Civ. 2167,  2008 WL 4200577, at *6 (S.D.N.Y. Sep. 12, 2008) ("[Judge Pitman's] principal reason for not extending discovery was plaintiff's failure to pursue discovery during the first half of 2006.").

Nor do Plaintiff's contentions regarding the absence of an opportunity to take discovery from the defendants who were added after the discovery period closed warrant reconsideration, as the Court's grant of permission to add those defendants, some of whom were substituted for "DOE" defendants, was limited to the assertion of the already-extant claims concerning Amoral Dilemma, Jailbabe.com and related works.  See Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 163112, at * 8 (S.D.N.Y. Jan. 24, 2007) (Granting Plaintiff's motion to amend in part: "Plaintiff may assert the relevant remaining claims in this action against 7th Cavalry Productions, Inc.; Big House Productions, Inc.; The Writers Guild of America, West; Peter Filardi; and Walt Disney Enterprises."); see also Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 2734633 at n. 9 (S.D.N.Y. Sep. 19, 2007) ("Plaintiff sought, and was granted, permission to file a Second Amended Complaint ("Complaint" or "SAC") that asserted the relevant remaining claims against five new Defendants").  Plaintiff has, moreover, proffered nothing in the way of specification of discovery material that she would have sought or obtained from the new defendants that would have been material to the outcome of the September 2007 decision.

Plaintiff's related argument – that Defendants were obligated to produce all interim draft screenplays generated during the creation of the final motion picture, Bringing

Down the House, in order to establish that the film was non-infringing – is similarly unavailing

to warrant reconsideration of the September 2007 decision.  Contrary to Plaintiff's assertion,

Defendants do not have the obligation of providing the Court with copies of the draft screenplays

with their summary judgment motion papers and their failure to do so is not a basis for

reconsideration.  As the Court explained in the September 2007 decision, the contents of

screenplay drafts that are not reflected in the finished motion picture are not relevant to the

substantial similarity analysis with respect to the motion picture.[4]  Insofar as Plaintiff now argues

---

[4]    While prior drafts may be relevant in determining such issues as independent creation and the likelihood that similar elements have been copied, see Walker, 784 F.2d at 52 ("Generally such early drafts might be useful to show that defendants had gained access to plaintiff's work, borrowed from it, and later made changes in order to conceal that borrowing . . . However, since we conclude as a matter of law that, even assuming borrowing or copying, no substantial similarity exists between the protectible portions of the final versions of the works, any error in exclusion of the early drafts was harmless."); Burns v. Imagine Films Entertainment, Inc.,  No. 92 Civ. 2438, 2001 WL 34059379, at *13 (W.D.N.Y. 2001) ("Defendants are entitled to prove at trial that drafts of the Backdraft screenplay predated their access to Plaintiffs' work, and to argue that story elements in those early drafts are non-infringing."); Davis v. United Artists, Inc., 547 F. Supp. 722, 724 n.9 (S.D.N.Y. 1982) ("Plaintiff also claims that defendants' screenplays are substantially similar to his novel.  Since the ultimate test of infringement must be the film as produced and broadcast, we do not consider the preliminary scripts."); Fuld v. National Broadcasting Co., Inc., 390 F. Supp. 877, 883 n. 4 (S.D.N.Y. 1975) (refusing to address similarities alleged to exist in the defendant's original script but not incorporated into the film because "the ultimate test of infringement must be the television film as produced and broadcast - and not the preliminary scripts," although "[t]he claimed similarities in the two original scripts would, of course, be relevant if access were at issue"); see also See v. Durang, 711 F.2d 141, 142 (9th Cir. 1983) (rejecting plaintiff's claim that summary judgment precluded reasonable discovery where the only discovery that plaintiff suggested was the production of early drafts that "might reflect copying from plaintiff's play that was disguised or deleted in later drafts" because "[c]opying deleted or so disguised as to be unrecognizable is not copying."); Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1374 (5th Cir. 1981) (no error in allowing plaintiff to introduce preliminary and shooting script at trial because "the various scripts were relevant and admissible on the issue of

that she is also claiming copyright violations as to the screenplay drafts themselves, the Court

notes that Defendants produced numerous drafts to Plaintiff, whether or not Plaintiff read these

drafts. (See Conciatori Decl. ¶¶ 4; 5; Ex. M. (Trans. of 7/24/06 Conf. p. 21); Ex. N (Pl's Dep.

223-228).)  To the extent that Plaintiff asserts a claim of copyright infringement with respect to

the drafts, it is Plaintiff who has the obligation of showing that the drafts evidence substantial

similarity.

   "[W]here the nonmoving party will bear the burden of proof at trial on a

dispositive issue, a summary judgment motion may properly be made in reliance solely on the

pleadings, depositions, answers to interrogatories, and admissions on file."  Celotex Corp. v.

Catrett, 477 U.S. 317, 324 (1986) (internal quotations omitted); see also Burns v. Imagine Films

Entertainment, Inc., No. 92 Civ. 2438, 2001 WL 34059379, at *1(W.D.N.Y. 2001) ("A party

moving for summary judgment can meet its burden by producing evidence showing the absence

of a genuine issue of material fact or by pointing out to the court that there is an absence of

evidence supporting one or more essential elements of the non-moving party's case.") (citing

Celotex, 477 U.S. at 325) (emphasis added).   Rule 56(e) does not require the Defendants to

come forward with copies of the drafts to show the absence of substantial similarity, but does

require the Plaintiff to "designate specific facts showing that there is a genuine issue for trial."

Id. (internal quotations omitted).  Defendants' failure to produce the drafts in support of their

summary judgment motion does not, accordingly, warrant reconsideration of the Court's decision

------

independent creation, even though the ultimate test of infringement was the film
as broadcast"), no such issues were material to the September 2007 decision in
light of the Court's determination that there is no substantial similarity between
Plaintiff's Amoral Dilemma screenplay and the finished motion picture.

on that motion.

Nor does Plaintiff's assertion, first elaborated upon in the reconsideration motion practice and her response to the order to show cause, that she seeks statutory damages with respect to unpublished infringing works, warrant reconsideration of the September 2007 decision. A motion for reconsideration is not an opportunity to "reargue those issues already considered when a party does not like the way the original motion was resolved." In re Houbigant, Inc., 914 F. Supp. 997, 1001 (S.D.N.Y. 1996). "As such, a party . . . may not advance new facts, issues or arguments not previously presented to the Court." Id. (internal quotations omitted). A party seeking reconsideration "is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings." De Los Santos v. Fingerson, No. 97 Civ. 3972, 1998 WL 788781, at *1 (S.D.N.Y. Nov. 12, 1998).[5]

Finally, Plaintiff's proffer that Defendants obtained a copyright registration for one of the unpublished drafts is insufficient to warrant reconsideration. Plaintiff fails to identify any reason why evidence of this copyright registration was not provided to the Court in connection with the briefing of the underlying summary judgment motion or how the existence of copyright with respect to this admittedly unpublished draft screenplay would alter the Court's analysis regarding the relevance of unpublished interim draft screenplays to the analysis of whether the final motion picture infringed on Plaintiff's copyright in her screenplay. (See Pl's Mot. for Recon. p. 5-6.)

---

[5]    The Court addresses the merits of Plaintiff's argument that she has a viable cause of action with respect to individual drafts in connection with the discussion, infra, of Plaintiff's response to the Order to Show Cause.

Plaintiff now argues that reconsideration of the Court's conclusion that the interim drafts of a published non-infringing final work are not actionable under the Copyright Act is warranted, focusing on the allegedly infringing screenplays that were prepared during the film development and production process of <u>Bringing Down the House</u> as independently violative of the Copyright Act to the extent that they contain allegedly infringing material, rather than as evidence that the film <u>Bringing Down the House</u> violated her rights.  In so doing, Plaintiff has not identified any controlling law or factual matters raised on the underlying motion that the Court overlooked in its discussion of the drafts' significance in the context of her infringement claim against <u>Bringing Down the House</u>, but further develops an argument touched upon in passing in her opposition to the underlying summary judgment in connection with her argument that Defendants failed to meet their obligation to produce all screenplays to Plaintiff.  Thus, although Plaintiff has failed to meet the strict reconsideration standard, the Court will consider this argument, fully articulated for the first time in connection with the Plaintiff's reconsideration motion and her response to the Order to Show Cause, in connection with the Order to Show Cause.  For the reasons explained below, consideration of the independent claims against the drafts in the context of the record on the summary judgment motions would not, in any event, have precluded the grant of judgement in Defendants' favor.

Plaintiff's motion for reconsideration is, accordingly, denied.

<u>B. Disney Defendants' Application for Sanctions</u>

In their opposition to Plaintiff's reconsideration motion, the Disney Defendants also ask that the Court direct Plaintiff, pursuant to 28 U.S.C. § 1927, to pay "the excess costs, expenses and attorneys' fees reasonably incurred" because of her vexatious conduct.  Although

Section 1927 grants the Court the power to assess costs and attorneys' fees against "[a]ny attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously," the Second Circuit has made clear that such sanctions are only "proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986).

Although Plaintiff's reconsideration motion and numerous, voluminous applications and submissions in the course of this litigation have undoubtedly resulted in delays and unnecessary work for counsel as well as the Court, the Court cannot conclude that her actions in interposing the reconsideration motion were so completely without merit as to require the conclusion that they must have been undertaken for an improper purpose.  Indeed, Plaintiff seems to be motivated by a conviction that she has meritorious claims and that multiple reiterations of her arguments, coupled with invective regarding the actions and motivations of the Court and opposing counsel, will make their merit clearer to all involved.  The existence of such deep-rooted convictions has long been recognized in connection with copyright cases.  See e.g., Dellar v. Samuel Goldwyn, 150 F.2d 612, 613 (2d Cir. 1945) ("The action as a whole has been built up, partly upon a wholly erroneous understanding of the extent of copyright protection; and partly upon that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism.").  Accordingly, the Disney Defendants' application for section 1927 sanctions is denied.

III.     Plaintiff's Response to the Court's September 17, 2007, Order to Show Cause

On September 17, 2007, the Court ordered Plaintiff to show cause as to as to why, in light of the Court's September 2005 and September 2007 decisions as to the viability of Plaintiff's claims, the action ought not to be dismissed as against all remaining Defendants. Plaintiff submitted a response and the Guild submitted a reply to Plaintiff's response.

Plaintiff's response to the Court's Order reads like a motion for reconsideration. In fact, portions of Plaintiff's motion for reconsideration and her response to the Order to Show Cause are identical.   Instead of providing independent arguments as to why, in light of the Court's analysis and conclusions in its September 2005 and September 2007 decisions, the remaining claims should not be dismissed, Plaintiff argues principally that the Court erred in reaching those decisions.[6]  The Court has considered thoroughly the new arguments raised in Plaintiff's response.  None is sufficient to demonstrate why this case should not now be dismissed in its entirety.  The Court here addresses specifically the one new perspective on her claims that Plaintiff elucidates in her effort to avoid dismissal.

As noted earlier, Plaintiff now argues that her copyright infringement claims are directed not only at the finished motion picture Bringing Down the House, but also at any individual drafts of the screenplay of that picture that are substantially similar to, or incorporate protectible elements of her screenplay Amoral Dilemma.  See Walt Disney Productions v.

---

[6]     Plaintiff also attempts to incorporate, by reference, arguments from a number of other motions.  This appears to be an attempt to circumvent the fifteen page limit that the Court imposed on Plaintiff's response to the September 17, 2007, Order to Show Cause and to reiterate nearly every argument that Plaintiff has previously raised in order to avoid summary judgment.  Those prior arguments have already been considered and ruled on in earlier decisions and will not be discussed again here.

Filmation Associates, 628 F. Supp. 871 (C.D.Cal. 1986) ("To constitute an actionable copy,

therefore, an expression need only be a material object permanently cas[t] in some intelligible

form." citing 2 Nimmer on Copyrights, § 8.02(B), pp. 8-22-8-25 (1985).)  Plaintiff argues that, to

defeat this claim, Defendants must produce all of the screenplay drafts and demonstrate that they

are non-infringing.

    Plaintiff misapprehends the nature of her burden in this action.  It is Plaintiff who

has the obligation of coming forward with evidence showing a genuine issue of material fact as

to the substantial similarity of the drafts.  Celotex, 477 U.S. at 324.  Plaintiff has obtained a

substantial number of screenplay drafts in the course of discovery.  To the extent she did not

obtain all of the drafts, her requests for them and/or complaints about failures to respond to

requests have been addressed on multiple occasions.[7]  Whether the drafts are characterized as

infringing separate literary works or unauthorized derivative works, Plaintiff has the burden of

establishing the substantial similarity of the drafts as to copyrightable elements of her screenplay.

See Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 747 (2d Cir. 1998) ("To prove

infringement, a plaintiff must show that: (1) the defendant actually copied the plaintiff's work;

and (2) the copying is illegal because a 'substantial similarity' exists between the defendant's

---

[7]  The Court denied Plaintiff's Rule 56(f) application for further discovery in the September 2007 decision and noted that applications for reopening discovery or for supplemental discovery would not be considered.  Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 2734633 at *3, *10, n. 9 (S.D.N.Y. Sep. 19, 2007); see also Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 2398762, at *2-3 (S.D.N.Y. Aug. 15, 2007) (Judge Pitman denying Plaintiff's request to extend discovery and for an extension of time to raise discovery disputed); Flaherty v. Filardi,  No. 03 Civ. 2167,  2008 WL 4200577 (S.D.N.Y. Sep. 12, 2008) (denying reconsideration of the August 15, 2007 decisions).

work and the protectible elements of the plaintiff's work."); Celotex, 477 U.S. at 322 (under Rule

56(c) summary judgment must be granted "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."); see also Mannion v. Coors Brewing Co., 377 F. Supp. 2d 444,

n. 28 (S.D.N.Y. 2005) ("'[A] work will be considered a derivative work only if it would be

considered an infringing work' absent consent," quoting 1 Nimmer on Copyright § 3.01 at 34.).

Plaintiff has identified only two drafts that she claims infringe her rights.  The

Court has reviewed each of them carefully to determine whether there is any genuine issue of fact

as to substantial similarity with respect to protectible elements of Amoral Dilemma, and finds for

the following reason that there is none.

## A. The Allegedly Infringing Drafts

### 1.  Suburban Sista

In Suburban Sista, the Peter Potts character is no longer a 33-year-old lawn boy,

but is a risk adverse 40-year-old tax attorney with two children.  Peter's wife, Kate, is divorcing

him because she thinks that the spark has left their marriage and Peter is not interested in being

involved the family's life.  Chastity, the prisoner character, is portrayed as a large, 35-year-old

African American woman who claims to have been wrongfully convicted.

Peter is disturbed to discover that the woman he has been corresponding with

online is a prisoner and becomes more concerned when Chastity, looking nothing like her

picture, shows up on his doorstep.  Despite his many attempts to get rid of her, she keeps

reappearing and Peter slowly comes to terms with her presence.  Peter opens up to Chastity about

the problems in his marriage and admits that he is still very much in love with his wife.  Chastity

offers to help Peter get Kate back.  Peter's kids also take to Chastity – she plays basketball, dice and cards with Georgey and provides advice to Sarah.  Chastity even goes after the boy who hurts Sarah's feelings.  Eventually Chastity is able to bring Peter and his children closer.

After being threatened by FBI agents, Peter learns that Chastity was not released for good behavior, but escaped from prison, and he kicks her out of the house.  Peter realizes that Chastity is telling the truth about her innocence after a run-in with someone from her past, Widow.  In an uncharacteristic move – and one that earns his kids' respect – Peter offers to speak to Widow while wearing a microphone in an attempt to prove Chastity's innocence.  When the meeting goes bad, Chastity comes to Peter's rescue.  Widow admits to setting Chastity up, but then shoots her in the chest.  Luckily, the gold tooth Chastity has in her pocket saves her, and Widow is bitten by one of his own deadly spiders.  The newly confident Peter convinces Kate that a divorce is a bad idea and that he is going to quit his job to spend more time with her.  In the final scene, Chastity and Peter's friend Lucky are getting married.

The rest of Suburban Sista resembles its predecessor JAILBABE.COM: Peter's parents try to set him up with a prostitute; Chastity gets to Peter's home in a UPS truck; Peter faces down a rooster when trying to break up a cock-fight; Peter's parents are relieved that he has met a woman; Chastity gets into a fight with Kate's best friend in a bathroom; Peter gets Chastity a makeover; Peter and Chastity go to Benihana; Peter walks in on his parents; and the authorities conduct a raid on Peter's home.

2.  In the Houze

The In the Houze protagonist is a much more confident, late-40s, divorced, tax attorney, Peter Sanderson, who seems to be more committed to his job than to his family.  Peter

is corresponding online with "Lawyergirl," whom he believes to be a white, female attorney. Peter and Lawyergirl arrange to meet and Peter discovers, to his dismay, that "Lawyergirl" is actually a large African-American, female, ex-convict, Charlene, who claims that she is innocent of the crime of which she was convicted and who wants Peter's help reopening her case.

Peter does his best to get rid of Charlene, but she is there to stay.  Her presence puts Peter's attempt to secure the elderly and conservative Mrs. Arness as a new client – the reason he cancelled a family vacation in Hawaii – in jeopardy.  Using Peter's concern over the Arness account as leverage, Charlene finally persuades Peter to work on her case and to allow her to stay until her record is expunged.  Concerned that his colleagues and his nosy, racist neighbor might not approve of Charlene, Peter tries to hide her identity by introducing her as his children's nanny and by providing Charlene with a new, less-urban look.  Peter's best friend and coworker, Howie, is attracted to Charlene and does his best to impress her.  Charlene is there for Peter's children, Georgey and Sarah, even going after Sarah's boyfriend when he treats her poorly.  After realizing that Peter is still in love with his ex-wife, Charlene offers to help him get her back.

Peter's attempts to secure the Arness account unravel when Mrs. Arness, while having dinner at Peter's home, discovers that Charlene is not the children's nanny but rather an escaped convict.  Mrs. Arness refuses to hire Peter, and Peter kicks Charlene out of his house. Peter then learns that Charlene was framed by her ex-boyfriend, Widow, and seeks out Widow at a nightclub in order to obtain a taped confession.  Howie and Charlene kidnap Mrs. Arness and her dog and go to the nightclub to track Peter down.

Doing his best to blend in at the nightclub, Peter is able to locate Widow, and using a boom box, secure a confession.  Charlene is shot in the chest when a fight breaks out in

the club, but is not seriously injured because the bullet hits Peter's cell phone, which is tucked into her cleavage.  At the end of the screenplay, Charlene is formally exonerated, and Mrs. Arness changes her mind about Peter.  Peter quits his law firm job to open his own practice with Howie as his partner and Mrs. Arness as his first client, and gets back together with Kate.

There have been additional revisions to the script.  The cockfight has been replaced by a rowdy pool party; the role of Kate's best friend has changed into Kate's younger, more attractive and unpleasant sister; instead of a dinner at Benihana, there is dinner and dancing at a fancy restaurant; and Peter's best friend no longer appears to have a facial birthmark, cauliflower ear or lisp.

<u>B. Similarity to Amoral Dilemma</u>

<u>1.  Plot, Theme, and Total Concept and Feel</u>

<u>Suburban Sista</u> and <u>In the Houze</u> are not substantially similar to <u>Amoral Dilemma</u> with respect to copyrightable elements of Plaintiff's work.  Neither the plot, theme, or total concept and feel of these two drafts are similar to that of <u>Amoral Dilemma</u>.  In <u>Suburban Sista</u>, an overly cautious tax attorney facing divorce begrudgingly helps a convicted felon and, in exchange, becomes more confident, closer to his children and the type of man his wife wants.  In <u>In the Houze</u>, the confident, divorced tax attorney is having trouble balancing his work and family obligations, but, in helping a convicted felon, is able to win back his divorced wife, become closer to his children and succeed professionally on his own.  Both screenplays address cultural differences amongst individuals of different socioeconomic and racial backgrounds and the comedy resulting from the juxtaposition of such individuals.  <u>Suburban Sista</u> is still a raunchy comedy with mostly physical and scatological humor, while <u>In the Houze</u> has developed into a

more family-oriented comedy.

In contrast, <u>Amoral Dilemma</u>, a dark, suspenseful drama involving violent situations, focuses on a young female attorney's dissatisfaction with her legal practice and the corruption of the legal system.  This corruption is revealed through both her civil practice and her experiences with the prison and prosecutorial offices that she encounters after corresponding with a male inmate.  <u>Amoral Dilemma</u> also addresses a woman's attempt to deal with a failed relationship and the desire to take revenge on men.

2.  Characters

Neither are the drafts similar to Plaintiff's <u>Amoral Dilemma</u> with respect to the characters.  Although both draft screenplays have an attorney protagonist, as does <u>Amoral Dilemma</u>, the attorneys are very different.  <u>Amoral Dilemma</u> stars a young, female attorney who is unhappy with her job in insurance litigation and who has recently broken up with her coworker boyfriend because he cheated on her.  The attorney protagonist in both <u>Suburban Sista</u> and <u>In the Houze</u> is an uptight middle-aged white, male father-of-two whose wife is divorcing or has divorced him because he is more focused on his work than his family.  As the Court has previously held, "the portrayal of a dissatisfied attorney in a competitive job amounts to a 'scene a faire' and is a non-protectible general idea, not the protectible expression of an idea."  <u>Flaherty v. Filardi</u>, 388 F. Supp. 2d 274, 287 (S.D.N.Y. 2005).

The character of the white, male prisoner in <u>Amoral Dilemma</u> is not well-developed, but, from what the screenplay reveals, he is different from both Chastity, in <u>Suburban Sista</u>, and Charlene, in <u>In the Houze</u>.  Both are tough, streetwise African-American women with good hearts.  Additionally, the supporting characters in <u>Amoral Dilemma</u> consist of the

protagonist's best friend, a tough, young female advertising executive, and the protagonist's

colleagues.  In both Suburban Sista and In the Houze, the main supporting characters consist of

the protagonist's best friend – another male attorney – his children, wife or ex-wife, neighbors,

some colleagues and, in In the Houze, a potential client.

3.  Setting, Sequence and Pace

Finally, the settings, sequence and pace of the submitted draft screenplays are not

substantially similar with regard to copyrightable elements of Plaintiff's work.  Amoral Dilemma

is set in New York City and in a small town in Pennsylvania.  Scenes occur in a law office, the

protagonist's apartment, a bar, a hospital, the prison, the district attorney's office, and the mail

room clerk's apartment.  In Suburban Sista, scenes take place the protagonist's home, his law

firm, country club, a Benihana restaurant, and on a boat.  In the Houze is set in the protagonist's

well-appointed suburban home, his law firm, a country club, an upscale restaurant, and an urban

nightclub.  Any similarity in the settings of the draft screenplay and Amoral Dilemma, such as

the fact that both contain scenes set in a law office, are too general to be protectible.  See

Williams, 84 F.3d at 589 (finding that even though both works involved a dinosaur zoo and both

contained electrified fences, automated tours, dinosaur nurseries, and uniformed workers, such

elements of settings were "scenes a faire").

Amoral Dilemma, which involves more subplots, is faster-paced and seems to

jump around more that the draft screenplays; it makes heavy use of flashbacks and dream

sequences.  Both Suburban Sista and In the Houze are slower moving, focus on the one main plot

and unfold in a more linear fashion.  Nor is there a similarity in the sequence of events between

the two drafts and the Plaintiff's work.  Plaintiff's claim, in her opposition to the underlying

motion, that the sequence in Amoral Dilemma is similar to that in Suburban Sista because the protagonist and best friend both share a meal and discuss the difficulties with their love life after being congratulated for winning a case is not only inaccurate – immediately preceding Peter's lunch with Lucky in Suburban Sista, Peter meets with an elderly client, the client's gold-digging girlfriend and the client's irate son regarding a change to the client's will – but unavailing.  There is nothing protectible about a lead character discussing romantic difficulties with his or her best friend over a meal following compliments on a job well done.  Plaintiff's other claims about the sequence of events in the draft screenplays and her work are similarly inaccurate or unavailing.

As the foregoing analysis reveals, neither Suburban Sista nor In the Houze, the draft screenplays that the Court has before it, are substantially similar to Amoral Dilemma under an application of the "ordinary observer" test.  Nor does the analysis support Plaintiff's argument that Defendants appropriated and incorporated specific copyrightable elements of her screenplay into the draft screenplays that were generated during the creation of the motion picture, Bringing Down the House.

Plaintiff argued, in her opposition papers on the underlying motion, that the change in the protagonist's occupation, the use of certain character names, the undercover activity by the lawyer protagonist, the prisoner's belief of innocence, the protagonist lying to the police, and the prisoner's appearance at the protagonist's home are all evidence of Defendants' improper copying and inclusion of portions of Plaintiff's Amoral Dilemma in Suburban Sista.  However, even viewed in the light most favorable to the Plaintiff, to the extent that Plaintiff's characterization of the scenes in Suburban Sista is accurate, the identified "similarities" are, in fact, only with respect to general non-copyrightable ideas (such as a lawyer protagonist) or

"scenes a faire" necessarily resulting from the chosen situation (such as going undercover or lying to the police in order to determine and prove an individual's innocence).  See Warner Bros., 720 F.2d at 242; see also Zambito v. Paramount Pictures Corp., 613 F. Supp. 1107, 1112 (E.D.N.Y. 1985) (treasure hidden in cave inhabited by snakes, fire used to repel snakes, weary traveler seeking solace in a tavern all too general to be protectible); Smith v. Weinstein, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984) (using prison rodeo as escape device is non-protectible element).  Plaintiff does not specifically allege any similarities with respect to Amoral Dilemma and the screenplay In the Houze that are distinct from those she previously identified with regard to the motion picture Bringing Down the House.  See Flaherty v. Filardi, 388 F. Supp. 2d 274 (S.D.N.Y. 2005)

Because there is no substantial similarity between Plaintiff's Amoral Dilemma and Suburban Sista or In the Houze and Plaintiff has failed to come forward with evidence of such similarity with respect to any other drafts, Plaintiff has failed to meet her burden in showing that the action ought not to be dismissed.  Plaintiff has failed to identify any genuine issue of material fact with respect to the substantial similarity of her work and the interim drafts and thus made no showing that a different determination could reasonably be expected to alter the Court's conclusion that summary judgment in all Defendants' favor is warranted.

IV.   The Guild's Motion to Dismiss

The Court held the Guild's motion to dismiss based on improper service and pleading insufficiency (docket entry no. 225) in abeyance until resolution of the Court's September 17, 2007, Order to Show Cause as to why the action ought not to be dismissed as against all remaining Defendants.  (See Docket Entry No. 255 (September 17, 2007, Order to

Show Cause) at n.1.)  In light of the Court's determination, as laid out in this Opinion, that the action ought to be dismissed against all remaining Defendants, the Guild's pending motion to dismiss is moot and need not be addressed.

V.     Plaintiff's Cross-Motion for Summary Judgment as to the Guild

In response to the Guild's motion to dismiss, Plaintiff cross-moved for summary judgment in her favor.  (See Docket Entry No. 254.)  In light of the Court's determination that summary judgment in Defendants' favor is warranted with respect to the remaining claims, Plaintiff's cross-motion for summary judgment is denied.

VI.    Plaintiff's Objections to Magistrate Judge Pitman's Opinions and Orders dated August 14, 2007, and September 12, 2008

Plaintiff objects to Magistrate Judge Pitman's Opinion and Order dated August 14, 2007, and his denial of her motion for reconsideration of that Opinion and Order in a separate Opinion and Order dated September 12, 2008.  These decisions addressed various scheduling and discovery disputes, and familiarity with the decisions is presumed.  See Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 2398762, at *2 (S.D.N.Y. Aug. 15, 2007); Flaherty v. Filardi,  No. 03 Civ. 2167,  2008 WL 4200577, at *6 (S.D.N.Y. Sep. 12, 2008).  Plaintiff requests that the Court overrule Judge Pitman's decisions, as well as enter a default judgment against all the Defendants, impose sanctions against the Defense Attorneys and Defendants, grant Plaintiff an award of attorneys fees and costs, and issue a scheduling order for the "New Defendants" and/or grant the relief requested in the motions that are the subject of the Magistrate Judge's decisions to which Plaintiff objects.

Under Federal Rule of Civil Procedure 72(a), when a party objects to a magistrate judge's decision on a non-dispositive matter, "[t]he district judge to whom the case is assigned

shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."  An order is clearly erroneous if, "'on the entire evidence,' the [district court] is 'left with the definite and firm conviction that a mistake has been committed.'"  Easley v. Cromartie, 532 U.S. 234, 243 (2001) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).  "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure."  Thompson v. Keane, No. 95 Civ. 2442, 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996) (internal quotations omitted).  The "clearly erroneous" standard is "highly deferential[, and] . . . magistrate judges are afforded broad discretion in resolving non-dispositive disputes and reversal is appropriate only if their discretion is abused."  Derthick v. Bassett-Walker, Inc., Nos. 90 Civ. 5427, 90 Civ. 7479, & 90 Civ. 3845, 1992 WL 249951, at *8 (S.D.N.Y. Sept. 23, 1992).

Plaintiff argues that her October 6, 2006, motion for default judgment sanctions should be considered dispositive and subject to a de novo review.  However, Judge Pitman did not grant, or recommend granting, Plaintiff's requested sanction.  See Colida v. Nokia Inc., No. 07 Civ. 8056, 2008 WL 4449419, at *2, n. 4 (S.D.N.Y. 2008) (noting that "[d]istrict courts in the Second Circuit have generally read [Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d. Cir. 1990)] as standing for the proposition that whether any particular motion for sanctions is dispositive or non-dispositive depends on whether the sanctions imposed actually dispose of a claim.")  Furthermore, this Court considered the same arguments in connection with Plaintiff's Rule 56(f) affirmation and denied that application for substantially the same reasons that Judge Pitman cited in denying Plaintiff's October 6, 2006, motion for default judgment.  See Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 2734633 at *3 (S.D.N.Y. Sep. 19, 2007) ("Plaintiff

acknowledges that her Rule 56(f) affirmation is 'nearly verbatim to her October 6, 2006 Motion

for Default Judgment.'  For substantially the same reasons that Judge Pitman articulated in

denying Plaintiff's admittedly identical motion for default judgment, this Court denies Plaintiff's

Rule 56(f) application." (internal citation omitted).)

        None of Plaintiff's objections to Judge Pitman's orders demonstrates that Judge

Pitman's decisions were clearly erroneous or contrary to law in any respect.  A careful review of

Judge Pitman's thorough decisions reveals careful consideration of Plaintiff's claims and

application of the relevant law.  Plaintiff's arguments in connection with the nature and quantum

of discovery permitted and obtained have been raised and ruled on numerous times in the course

of this litigation and her most recent objections do not identify any grounds warranting

overruling or departing from the prior decisions.  Thus, Plaintiff's objections to Judge Pitman's

decisions dated August 14, 2007, and September 12, 2008, are overruled.

        Plaintiff's additional requested relief is also denied in light of the Court's

overruling of Plaintiff's objections.  Plaintiff's additional relief is, in essence, a request for the

relief that was requested in the motions and requests underlying Judge Pitman's decisions, and an

attempted end run around the applicable standard of review.

    VII.   <u>The Disney and B&L Defendants' Request for Sanctions and Motion to Strike</u>

        In their joint response to Plaintiff's objections to Judge Pitman's decisions, the

Disney and B&L Defendants request sanctions pursuant to 28 U.S.C. § 1927 and the Court's

inherent authority, in connection with her objections.  The Court has addressed the relevant

standard for determining whether an award pursuant to Section 1927 is warranted in relation to

the Disney Defendants' request for costs and fees in connection with Plaintiff's motion for

reconsideration.  Although the Court recognizes that Plaintiff's objections to Judge Pitman's decisions have prolonged the litigation and that, in light of prior rulings on these arguments, her conduct borders on frivolous, the Court cannot conclude that her actions in raising her objections were so completely without merit as to require the conclusion that they must have been undertaken for an improper purpose.  For substantially the same reasons, the Court denies the application insofar as it appeals to the Court's inherent authority.

The Court does grant Defendants' Joint Motion to Strike Plaintiff's Declaration. By Order dated November 14, 2008, Plaintiff was granted leave to file a response to the Disney and B&L Defendants' suggestion, in their papers responding to Plaintiff's objection to Judge Pitman's decisions, that the Court impose sanctions on Plaintiff.  (See Docket Entry No. 308.) Plaintiffs was specifically directed to limit her response to no more than five pages in length, and to limit the scope of the response to the possible imposition of sanctions on Plaintiff.  (Id.)  In flagrant disregard of the Court's direction, Plaintiff submitted not only a five-page declaration, but also 22 pages of attached exhibits, including a sexually explicit portion of a draft screenplay, a copy of a Boston Globe interview of one of the named Defendants, a myspace page purportedly belonging to another of the named Defendants, and several articles relating to convicted and alleged sex offenders.  Plaintiff's declaration and the attached exhibits, which exceed the Court-imposed page limitations and fall far outside the scope of the subject she was permitted to address, are a clear, and repeated, attempt to cast Defendants in a negative light.  The motion to strike the declaration and attached exhibits is granted.

## CONCLUSION

For the reasons explained above, the pending applications are resolved as follows.

The Defendants' motion for summary judgment (docket entry nos. 157 and 162) with regard to Defendants Filardi and Tobia's sale of the work JAILBABE.COM, previously held in abeyance, is granted. Plaintiff's motion for reconsideration (docket entry no. 261) is denied and Disney Defendants' request for costs and fees pursuant to Section 1927 is also denied. Plaintiff has failed to show cause as to why the remaining claims should not be dismissed against all remaining Defendants; all remaining claims are therefore dismissed against the remaining Defendants. The Guild's motion to dismiss (docket entry no. 225) is mooted by the Court's decision to dismiss the as against the remaining Defendants. Plaintiff's cross-motion for summary judgment (docket entry no. 254) is denied. Plaintiff's objections (docket entry no. 305) to Magistrate Judge Pitman's Opinions and Orders dated August 14, 2007, and September 12, 2008, are overruled and Judge Pitman's decisions are affirmed. The Disney and B&L Defendants' request for sanctions in connection with Plaintiff's objections to Judge Pitman's decisions is denied and the Disney and B&L Defendants' request to strike Plaintiff's response (docket entry no. 314) to that request for sanctions is granted. Plaintiff's motion for Judge Pitman's recusal (docket entry no. 289) is terminated as moot in light of the closing of this case.

The Clerk of Court is respectfully requested to enter judgment in Defendants' favor, to terminate docket entry nos. 157, 162, 225, 254, 261, 289, and 314 and all other pending motions, and close this case.

SO ORDERED.

Dated: New York, New York
March 20, 2009

LAURA TAYLOR SWAIN
United States District Judge